# SOUTHLAND CORP. ET AL. *v.* KEATING ET AL.

No. 82–500.   Argued October 4, 1983—Decided January 23, 1984

2

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 17. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 21.

*Mark J. Spooner* argued the case for appellants. With him on the briefs were *Peter K. Bleakley* and *Martin H. Kresse*.

*John F. Wells* argued the cause for appellees. With him on the brief were *Lise A. Pearlman* and *Fonda Karelitz*.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

This case presents the questions (a) whether the California Franchise Investment Law, which invalidates certain arbitration agreements covered by the Federal Arbitration Act, violates the Supremacy Clause and (b) whether arbitration under the federal Act is impaired when a class-action structure is imposed on the process by the state courts.

I

Appellant Southland Corp. is the owner and franchisor of 7–Eleven convenience stores. Southland's standard franchise agreement provides each franchisee with a license to use certain registered trademarks, a lease or sublease of a convenience store owned or leased by Southland, inventory

---

*A brief of *amici curiae* was filed by *Simon H. Trevas* for the Securities Division of the State of Washington et al.

4

financing, and assistance in advertising and merchandising. The franchisees operate the stores, supply bookkeeping data, and pay Southland a fixed percentage of gross profits. The franchise agreement also contains the following provision requiring arbitration:

> "Any controversy or claim arising out of or relating to this Agreement or the breach hereof shall be settled by arbitration in accordance with the Rules of the American Arbitration Association . . . and judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction thereof."

Appellees are 7–Eleven franchisees. Between September 1975 and January 1977, several appellees filed individual actions against Southland in California Superior Court alleging, among other things, fraud, oral misrepresentation, breach of contract, breach of fiduciary duty, and violation of the disclosure requirements of the California Franchise Investment Law, Cal. Corp. Code Ann. § 31000 *et seq.* (West 1977). Southland's answer, in all but one of the individual actions, included the affirmative defense of failure to arbitrate.

In May 1977, appellee Keating filed a class action against Southland on behalf of a class that assertedly includes approximately 800 California franchisees. Keating's principal claims were substantially the same as those asserted by the other franchisees. After the various actions were consolidated, Southland petitioned to compel arbitration of the claims in all cases, and appellees moved for class certification.

The Superior Court granted Southland's motion to compel arbitration of all claims except those claims based on the Franchise Investment Law. The court did not pass on appellees' request for class certification. Southland appealed from the order insofar as it excluded from arbitration the claims based on the California statute. Appellees filed a petition for a writ of mandamus or prohibition in the Cali-

fornia Court of Appeal arguing that the arbitration should proceed as a class action.

The California Court of Appeal reversed the trial court's refusal to compel arbitration of appellees' claims under the Franchise Investment Law. *Keating* v. *Superior Court, Alameda County,* 167 Cal. Rptr. 481 (1980). That court interpreted the arbitration clause to require arbitration of all claims asserted under the Franchise Investment Law, and construed the Franchise Investment Law not to invalidate such agreements to arbitrate.[1]  Alternatively, the court concluded that if the Franchise Investment Law rendered arbitration agreements involving commerce unenforceable, it would conflict with § 2 of the Federal Arbitration Act, 9 U. S. C. § 2, and therefore be invalid under the Supremacy Clause. 167 Cal. Rptr., at 493–494. The Court of Appeal also determined that there was no "insurmountable obstacle" to conducting an arbitration on a classwide basis, and issued a writ of mandate directing the trial court to conduct class-certification proceedings. *Id.,* at 492.

The California Supreme Court, by a vote of 4–2, reversed the ruling that claims asserted under the Franchise Investment Law are arbitrable. *Keating* v. *Superior Court of Alameda County,* 31 Cal. 3d 584, 645 P. 2d 1192 (1982). The California Supreme Court interpreted the Franchise Investment Law to require judicial consideration of claims brought under that statute and concluded that the California statute did not contravene the federal Act. *Id.,* at 604, 645 P. 2d, 1203–1204. The court also remanded the case to the trial court for consideration of appellees' request for classwide arbitration.

---

[1] California Corp. Code Ann. § 31512 (West 1977) provides: "Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law or any rule or order hereunder is void."

We postponed consideration of the question of jurisdiction pending argument on the merits. 459 U. S. 1101 (1983). We reverse in part and dismiss in part.

## II

### A

Jurisdiction of this Court is asserted under 28 U. S. C. § 1257(2), which provides for an appeal from a final judgment of the highest court of a state when the validity of a challenged state statute is sustained as not in conflict with federal law. Here Southland challenged the California Franchise Investment Law as it was applied to invalidate a contract for arbitration made pursuant to the Federal Arbitration Act. Appellees argue that the action of the California Supreme Court with respect to this claim is not a "final judgment or decree" within the meaning of § 1257(2).

Under *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 482–483 (1975), judgments of state courts that finally decide a federal issue are immediately appealable when "the party seeking review here might prevail [in the state court] on the merits on nonfederal grounds, thus rendering unnecessary review of the federal issue by this Court, and where reversal of the state court on the federal issue would be preclusive of any further litigation on the relevant cause of action . . . ." In these circumstances, we have resolved the federal issue "if a refusal immediately to review the state-court decision might seriously erode federal policy." *Id.,* at 483.

The judgment of the California Supreme Court with respect to this claim is reviewable under *Cox Broadcasting, supra.* Without immediate review of the California holding by this Court there may be no opportunity to pass on the federal issue and as a result "there would remain in effect the unreviewed decision of the State Supreme Court" holding that the California statute does not conflict with the Federal Arbitration Act. *Id.,* at 485. On the other hand, reversal

of a state-court judgment in this setting will terminate litigation of the merits of this dispute.

Finally, the failure to accord immediate review of the decision of the California Supreme Court might "seriously erode federal policy." Plainly the effect of the judgment of the California court is to nullify a valid contract made by private parties under which they agreed to submit all contract disputes to final, binding arbitration. The federal Act permits "parties to an arbitrable dispute [to move] out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1, 22 (1983).

Contracts to arbitrate are not to be avoided by allowing one party to ignore the contract and resort to the courts. Such a course could lead to prolonged litigation, one of the very risks the parties, by contracting for arbitration, sought to eliminate. In *The Bremen* v. *Zapata Off-Shore Co.*, 407 U. S. 1, 12 (1972), we noted that the contract fixing a particular forum for resolution of all disputes

> "was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts."

The *Zapata* Court also noted that

> "the forum clause was a vital part of the agreement, and it would be unrealistic to think that the parties did not conduct their negotiations, including fixing the monetary terms, with the consequences of the forum clause figuring prominently in their calculations." *Id.*, at 14 (footnote omitted).

For us to delay review of a state judicial decision denying enforcement of the contract to arbitrate until the state-court litigation has run its course would defeat the core purpose of

a contract to arbitrate. We hold that the Court has jurisdiction to decide whether the Federal Arbitration Act preempts § 31512 of the California Franchise Investment Law.

## B

That part of the appeal relating to the propriety of superimposing class-action procedures on a contract arbitration raises other questions. Southland did not contend in the California courts that, and the state courts did not decide whether, state law imposing class-action procedures was pre-empted by federal law. When the California Court of Appeal directed Southland to address the question whether state or federal law controlled the class-action issue, Southland responded that *state law* did not permit arbitrations to proceed as class actions, that the Federal Rules of Civil Procedure were inapplicable, and that requiring arbitrations to proceed as class actions "could well violate the [federal] constitutional guaranty of procedural due process."[2] Southland did not claim in the Court of Appeal that if state law required class-action procedures, it would conflict with the federal Act and thus violate the Supremacy Clause.

In the California Supreme Court, Southland argued that California law applied but that neither the contract to arbitrate nor state law authorized class-action procedures to govern arbitrations. Southland also contended that the Federal Rules were inapplicable in state proceedings. Southland pointed out that although California law provided a basis for class-action procedures, the Judicial Council of California acknowledged "the incompatibility of class actions and arbitration." Petition for Hearing 23. It does not appear that Southland opposed class procedures on *federal* grounds in the

---

[2] Supplemental Memorandum of Points and Authorities in Opposition to Petition for Writs of Mandate or Prohibition in Civ. No. 45162 (Ct. App. Cal., 1st App. Dist.), pp. 19–25.

California Supreme Court.[3]  Nor does the record show that the California Supreme Court passed upon the question whether superimposing class-action procedures on a contract arbitration was contrary to the federal Act.[4]

Since it does not affirmatively appear that the validity of the state statute was "drawn in question" *on federal grounds* by Southland, this Court is without jurisdiction to resolve this question as a matter of federal law under 28 U. S. C. § 1257(2).  See *Bailey* v. *Anderson*, 326 U. S. 203, 207 (1945).

---

[3] The question Southland presented to the State Supreme Court was "[w]hether a court may enter an order compelling a private commercial arbitration governed by the Federal Arbitration Act . . . to proceed as a class action even though the terms of the parties' arbitration agreement do not provide for such a procedure." Petition for Hearing in Civ. No. 45162 (Cal. 1980).  Southland argued that (1) the decision of the Court of Appeal "is in conflict with the decisions of other Courts of Appeal in this State," *id.*, at 3; (2) class actions would delay and complicate arbitration, increase its cost, and require judicial supervision, "considerations [which] strongly militate against the creation of class action arbitration procedures," *id.*, at 22; and (3) there was no basis in law for class actions.  According to appellants, the Federal Rules of Civil Procedure did not apply in California courts.  *Id.*, at 23.  Southland thus relied, not on federal law, but on California law in opposing class-action procedures.

[4] The California Supreme Court cited "[a]nalogous authority" supporting consolidation of arbitration proceedings by federal courts.  31 Cal. 3d, at 611–612, 645 P. 2d, at 1208.  *E. g., Compania Espanola de Petroleos, S. A.* v. *Nereus Shipping, S. A.*, 527 F. 2d 966, 975 (CA2 1975), cert. denied, 426 U. S. 936 (1976); *In re Czarnikow-Rionda Co.*, 512 F. Supp. 1308, 1309 (SDNY 1981).  This, along with support by other state courts and the California Legislature for consolidation of arbitration proceedings, permitted the court to conclude that class-action proceedings were authorized: "It is unlikely that the state Legislature in adopting the amendment to the Arbitration Act authorizing consolidation of arbitration proceedings, intended to preclude a court from ordering classwide arbitration in an appropriate case.  We conclude that a court is not without authority to do so."  31 Cal. 3d, at 613, 645 P. 2d, at 1209.  The California Supreme Court thus ruled that imposing a class-action structure on the arbitration process was permissible as a matter of state law.

III

As previously noted, the California Franchise Investment Law provides:

> "Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law or any rule or order hereunder is void." Cal. Corp. Code Ann. §31512 (West 1977).

The California Supreme Court interpreted this statute to require judicial consideration of claims brought under the state statute and accordingly refused to enforce the parties' contract to arbitrate such claims. So interpreted the California Franchise Investment Law directly conflicts with §2 of the Federal Arbitration Act and violates the Supremacy Clause.

In enacting §2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration. The Federal Arbitration Act provides:

> "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. §2.

Congress has thus mandated the enforcement of arbitration agreements.

We discern only two limitations on the enforceability of arbitration provisions governed by the Federal Arbitration

Act: they must be part of a written maritime contract or a contract "evidencing a transaction involving commerce"[5] and such clauses may be revoked upon "grounds as exist at law or in equity for the revocation of any contract." We see nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under state law.

The Federal Arbitration Act rests on the authority of Congress to enact substantive rules under the Commerce Clause. In *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395 (1967), the Court examined the legislative history of the Act and concluded that the statute "is based upon . . . the incontestable federal foundations of 'control over interstate commerce and over admiralty.'" *Id.*, at 405 (quoting H. R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924)). The contract in *Prima Paint*, as here, contained an arbitration clause. One party in that case alleged that the other had committed fraud in the inducement of the contract, although not of the arbitration clause in particular, and sought to have the claim of fraud adjudicated in federal court. The Court held that, notwithstanding a contrary state rule, consideration of a claim of fraud in the inducement of a contract "is for the arbitrators and not for the courts," 388 U. S., at 400. The Court relied for this holding on Congress' broad power to fashion substantive rules under the Commerce Clause.[6]

At least since 1824 Congress' authority under the Commerce Clause has been held plenary. *Gibbons* v. *Ogden*, 9 Wheat. 1, 196 (1824). In the words of Chief Justice Mar-

---

[5] We note that in defining "commerce" Congress declared that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U. S. C. § 1.

[6] The procedures to be used in an arbitration are not prescribed by the federal Act. We note, however, that *Prima Paint* considered the question of what issues are for the courts and what issues are for the arbitrator.

shall, the authority of Congress is "the power to regulate; that is, to prescribe the rule by which commerce is to be governed." *Ibid.* The statements of the Court in *Prima Paint* that the Arbitration Act was an exercise of the Commerce Clause power clearly implied that the substantive rules of the Act were to apply in state as well as federal courts. As Justice Black observed in his dissent, when Congress exercises its authority to enact substantive federal law under the Commerce Clause, it normally creates rules that are enforceable in state as well as federal courts. *Prima Paint, supra,* at 420.

In *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.,* 460 U. S., at 1, 25, and n. 32, we reaffirmed our view that the Arbitration Act "creates a body of federal substantive law" and expressly stated what was implicit in *Prima Paint, i. e.,* the substantive law the Act created was applicable in state and federal courts. *Moses H. Cone* began with a petition for an order to compel arbitration. The District Court stayed the action pending resolution of a concurrent state-court suit. In holding that the District Court had abused its discretion, we found no showing of exceptional circumstances justifying the stay and recognized "the presence of federal-law issues" under the federal Act as "a major consideration weighing against surrender [of federal jurisdiction]." 460 U. S., at 26. We thus read the underlying issue of arbitrability to be a question of substantive federal law: "Federal law in the terms of the Arbitration Act governs that issue in either state or federal court." *Id.,* at 24.

Although the legislative history is not without ambiguities, there are strong indications that Congress had in mind something more than making arbitration agreements enforceable only in the federal courts. The House Report plainly suggests the more comprehensive objectives:

> "The purpose of this bill is to make valid and enforcible [sic] agreements for arbitration contained *in contracts involv-*

*ing interstate commerce* or within the jurisdiction or *[sic]* admiralty, *or* which may be the subject of litigation in the Federal courts." H. R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924) (emphasis added).

This broader purpose can also be inferred from the reality that Congress would be less likely to address a problem whose impact was confined to federal courts than a problem of large significance in the field of commerce. The Arbitration Act sought to "overcome the rule of equity, that equity will not specifically enforce an[y] arbitration agreement." Hearing on S. 4213 and S. 4214 before a Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 6 (1923) (Senate Hearing) (remarks of Sen. Walsh). The House Report accompanying the bill stated:

> "The need for the law arises from . . . the jealousy of the English courts for their own jurisdiction. . . . This jealousy survived for so lon[g] a period that the principle became firmly embedded in the English common law and was adopted with it by the American courts. The courts have felt that the precedent was too strongly fixed to be overturned without legislative enactment . . . ." H. R. Rep. No. 96, *supra*, at 1–2.

Surely this makes clear that the House Report contemplated a broad reach of the Act, unencumbered by state-law constraints. As was stated in *Metro Industrial Painting Corp.* v. *Terminal Construction Co.*, 287 F. 2d 382, 387 (CA2 1961) (Lumbard, C. J., concurring), "the purpose of the act was to assure those who desired arbitration and whose contracts related to interstate commerce that their expectations would not be undermined by federal judges, or . . . by state courts or legislatures." Congress also showed its awareness of the widespread unwillingness of state courts to enforce arbitration agreements, *e. g.*, Senate Hearing, at 8, and that

such courts were bound by state laws inadequately providing for

> "technical arbitration by which, if you agree to arbitrate under the method provided by the statute, you have an arbitration by statute[;] but [the statutes] ha[d] nothing to do with validating the contract to arbitrate." *Ibid.*

The problems Congress faced were therefore twofold: the old common-law hostility toward arbitration, and the failure of state arbitration statutes to mandate enforcement of arbitration agreements. To confine the scope of the Act to arbitrations sought to be enforced in federal courts would frustrate what we believe Congress intended to be a broad enactment appropriate in scope to meet the large problems Congress was addressing.

JUSTICE O'CONNOR argues that Congress viewed the Arbitration Act "as a procedural statute, applicable only in federal courts." *Post*, at 25. If it is correct that Congress sought only to create a procedural remedy in the federal courts, there can be no explanation for the express limitation in the Arbitration Act to contracts "involving commerce." 9 U. S. C. § 2. For example, when Congress has authorized this Court to prescribe the rules of procedure in the federal courts of appeals, district courts, and bankruptcy courts, it has not limited the power of the Court to prescribe rules applicable only to causes of action involving commerce. See, e. g., 28 U. S. C. §§ 2072, 2075, 2076 (1976 ed. and Supp. V). We would expect that if Congress, in enacting the Arbitration Act, was creating what it thought to be a procedural rule applicable only in federal courts, it would not so limit the Act to transactions involving commerce. On the other hand, Congress would need to call on the Commerce Clause if it intended the Act to apply in state courts. Yet at the same time, its reach would be limited to transactions involving interstate commerce. We therefore view the "involving commerce" requirement in § 2, not as an inexplicable limitation on the power of the federal courts, but as a necessary

qualification on a statute intended to apply in state and federal courts.

Under the interpretation of the Arbitration Act urged by JUSTICE O'CONNOR, claims brought under the California Franchise Investment Law are not arbitrable when they are raised in state court. Yet it is clear beyond question that if this suit had been brought as a diversity action in a federal district court, the arbitration clause would have been enforceable.[7] *Prima Paint, supra.* The interpretation given to the Arbitration Act by the California Supreme Court would therefore encourage and reward forum shopping. We are unwilling to attribute to Congress the intent, in drawing on the comprehensive powers of the Commerce Clause, to create a right to enforce an arbitration contract and yet make the right dependent for its enforcement on the particular forum in which it is asserted. And since the overwhelming proportion of all civil litigation in this country is in the state courts,[8] we cannot believe Congress intended to limit the Arbitration Act to disputes subject only to *federal*-court jurisdiction.[9] Such an interpretation would frustrate con-

[7] Appellees contend that the arbitration clause, which provides for the arbitration of "any controversy or claim arising out of or relating to this Agreement or the breach hereof," does not cover their claims under the California Franchise Investment Law. We find the language quoted above broad enough to cover such claims. Cf. *Prima Paint,* 388 U. S., at 403–404, 406 (finding nearly identical language to cover a claim that a contract was induced by fraud).

[8] It is estimated that 2% of all civil litigation in this country is in the federal courts. Annual Report of the Director of the Administrative Office of the U. S. Courts 3 (1982) (206,000 filings in federal district courts in 12 months ending June 30, 1982, excluding bankruptcy filings); Flango & Elsner, Advance Report, The Latest State Court Caseload Data, 7 State Court J., 18 (Winter 1983) (approximately 13,600,000 civil filings during comparable period, excluding traffic filings).

[9] While the Federal Arbitration Act creates federal substantive law requiring the parties to honor arbitration agreements, it does not create any independent federal-question jurisdiction under 28 U. S. C. § 1331 or otherwise. *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.,* 460 U. S. 1, 25, n. 32 (1983). This seems implicit in the provisions in

gressional intent to place "[a]n arbitration agreement . . . upon the same footing as other contracts, where it belongs." H. R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924).

In creating a substantive rule applicable in state as well as federal courts,[10] Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements.[11]   We hold that § 31512 of the California Franchise Investment Law violates the Supremacy Clause.

_____

§ 3 for a stay by a "court in which such suit is pending" and in § 4 that enforcement may be ordered by "any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties." *Ibid.; Prima Paint, supra,* at 420, and n. 24 (Black, J., dissenting); *Krauss Bros. Lumber Co.* v. *Louis Bossert & Sons, Inc.,* 62 F. 2d 1004, 1006 (CA2 1933) (L. Hand, J.).

[10] The contention is made that the Court's interpretation of § 2 of the Act renders §§ 3 and 4 "largely superfluous." *Post,* at 31, n. 20.   This misreads our holding and the Act.   In holding that the Arbitration Act preempts a state law that withdraws the power to enforce arbitration agreements, we do not hold that §§ 3 and 4 of the Arbitration Act apply to proceedings in state courts.   Section 4, for example, provides that the Federal Rules of Civil Procedure apply in proceedings to compel arbitration.   The Federal Rules do not apply in such state-court proceedings.

[11] The California Supreme Court justified its holding by reference to our conclusion in *Wilko* v. *Swan,* 346 U. S. 427 (1953), that arbitration agreements are nonbinding as to claims arising under the federal Securities Act of 1933.   31 Cal. 3d, at 602, 645 P. 2d, at 1202–1203.   The analogy is unpersuasive.   The question in *Wilko* was not whether a state legislature could create an exception to § 2 of the Arbitration Act, but rather whether Congress, in subsequently enacting the Securities Act, had in fact created such an exception.

JUSTICE STEVENS dissents in part on the ground that § 2 of the Arbitration Act permits a party to nullify an agreement to arbitrate on "such grounds as exist at law or in equity for the revocation of any contract." *Post,* at 19.   We agree, of course, that a party may assert general contract defenses such as fraud to avoid enforcement of an arbitration agreement. We conclude, however, that the defense to arbitration found in the California Franchise Investment Law is not a ground that exists at law or in equity "for the revocation of *any* contract" but merely a ground that exists for the revocation of arbitration provisions in contracts subject to the California Franchise Investment Law.   Moreover, under this dissenting view,

## IV

The judgment of the California Supreme Court denying enforcement of the arbitration agreement is reversed; as to the question whether the Federal Arbitration Act precludes a class-action arbitration and any other issues not raised in the California courts, no decision by this Court would be appropriate at this time. As to the latter issues, the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring in part and dissenting in part.

The Court holds that an arbitration clause that is enforceable in an action in a federal court is equally enforceable if the action is brought in a state court. I agree with that conclusion. Although JUSTICE O'CONNOR's review of the legislative history of the Federal Arbitration Act demonstrates that the 1925 Congress that enacted the statute viewed the statute as essentially procedural in nature, I am persuaded that the intervening developments in the law compel the conclusion that the Court has reached. I am nevertheless troubled by one aspect of the case that seems to trouble none of my colleagues.

For me it is not "clear beyond question that if this suit had been brought as a diversity action in a federal district court, the arbitration clause would have been enforceable." *Ante,* at 15. The general rule prescribed by § 2 of the Federal

---

"a state policy of providing special protection for franchisees . . . can be recognized without impairing the basic purposes of the federal statute." *Post,* at 21. If we accepted this analysis, states could wholly eviscerate congressional intent to place arbitration agreements "upon the same footing as other contracts," H. R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924), simply by passing statutes such as the Franchise Investment Law. We have rejected this analysis because it is in conflict with the Arbitration Act and would permit states to override the declared policy requiring enforcement of arbitration agreements.

Arbitration Act is that arbitration clauses in contracts involving interstate transactions are enforceable as a matter of federal law. That general rule, however, is subject to an exception based on "such grounds as exist at law or in equity for the revocation of any contract." I believe that exception leaves room for the implementation of certain substantive state policies that would be undermined by enforcing certain categories of arbitration clauses.

The exercise of state authority in a field traditionally occupied by state law will not be deemed pre-empted by a federal statute unless that was the clear and manifest purpose of Congress. *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 157 (1978); see generally The Federalist No. 32, p. 200 (Van Doren ed. 1945) (A. Hamilton). Moreover, even where a federal statute does displace state authority, it "rarely occupies a legal field completely, totally excluding all participation by the legal systems of the states. . . . Federal legislation, on the whole, has been conceived and drafted on an *ad hoc* basis to accomplish limited objectives. It builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose." P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 470–471 (2d ed. 1973).

The limited objective of the Federal Arbitration Act was to abrogate the general common-law rule against specific enforcement of arbitration agreements, S. Rep. No. 536, 68th Cong., 1st Sess., 2–3 (1924), and a state statute which merely codified the general common-law rule—either directly by employing the prior doctrine of revocability or indirectly by declaring all such agreements void—would be pre-empted by the Act. However, beyond this conclusion, which seems compelled by the language of § 2 and case law concerning the Act, it is by no means clear that Congress intended entirely to displace state authority in this field. Indeed, while it is an understatement to say that "the legislative history of the . . . Act . . . reveals little awareness on the part of Congress that

state law might be affected," it must surely be true that given the lack of a "clear mandate from Congress as to the extent to which state statutes and decisions are to be superseded, we must be cautious in construing the act lest we excessively encroach on the powers which Congressional policy, if not the Constitution, would reserve to the states." *Metro Industrial Painting Corp.* v. *Terminal Construction Co.*, 287 F. 2d 382, 386 (CA2 1961) (Lumbard, C. J., concurring).

The textual basis in the Act for avoiding such encroachment is the clause of § 2 which provides that arbitration agreements are subject to revocation on such grounds as exist at law or in equity for the revocation of any contract. The Act, however, does not define what grounds for revocation may be permissible, and hence it would appear that the judiciary must fashion the limitations as a matter of federal common law. Cf. *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448 (1957). In doing so, we must first recognize that as the "'saving clause' in § 2 indicates, the purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395, 404, n. 12 (1967); see also, H. R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924). The existence of a federal statute enunciating a substantive federal policy does not necessarily require the inexorable application of a uniform federal rule of decision notwithstanding the differing conditions which may exist in the several States and regardless of the decisions of the States to exert police powers as they deem best for the welfare of their citizens. Cf. *Wallis* v. *Pan American Petroleum Corp.*, 384 U. S. 63, 69 (1966); see generally *Wilson* v. *Omaha Indian Tribe*, 442 U. S. 653, 671–672 (1979); *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715 (1979); *Clearfield Trust Co.* v. *United States*, 318 U. S. 363 (1943). Indeed, the lower courts generally look to state law regarding questions of formation of the arbitration agreement under § 2, see, *e. g.*, *Comprehensive Merchandising Catalogs,*

*Inc.* v. *Madison Sales Corp.*, 521 F. 2d 1210 (CA7 1975), which is entirely appropriate so long as the state rule does not conflict with the policy of § 2.

A contract which is deemed void is surely revocable at law or in equity, and the California Legislature has declared all conditions purporting to waive compliance with the protections of the Franchise Investment Law, including but not limited to arbitration provisions, void as a matter of public policy. Given the importance to the State of franchise relationships, the relative disparity in the bargaining positions between the franchisor and the franchisee, and the remedial purposes of the California Act, I believe this declaration of state policy is entitled to respect.

Congress itself struck a similar balance in § 14 of the Securities Act of 1933, 15 U. S. C. § 77n, and did not find it necessary to amend the Federal Arbitration Act. Rather, this Court held that the Securities Act provision invalidating arbitration agreements in certain contexts could be reconciled with the general policy favoring enforcement of arbitration agreements. *Wilko* v. *Swan*, 346 U. S. 427 (1953). Repeals by implication are of course not favored, and we did not suggest that Congress had intended to repeal or modify the substantive scope of the Arbitration Act in passing the Securities Act. Instead, we exercised judgment, scrutinizing the policies of the Arbitration Act and their applicability in the special context of the remedial legislation at issue, and found the Arbitration Act inapplicable. We have exercised such judgment in other cases concerning the scope of the Arbitration Act, and have focused not on sterile generalization, but rather on the substance of the transaction at issue, the nature of the relationship between the parties to the agreement, and the purpose of the regulatory scheme. See, *e. g.*, *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506 (1974), rev'g 484 F. 2d 611 (CA7 1973); see also, *id.*, at 615–620 (Stevens, Circuit Judge, dissenting). Surely the general language of the Arbitration Act that arbitration agreements are valid does not mean that all such agreements are valid

irrespective of their purpose or effect. See generally *Paramount Famous Lasky Corp.* v. *United States*, 282 U. S. 30 (1930) (holding arbitration agreement void as a restraint of trade).

We should not refuse to exercise independent judgment concerning the conditions under which an arbitration agreement, generally enforceable under the Act, can be held invalid as contrary to public policy simply because the source of the substantive law to which the arbitration agreement attaches is a State rather than the Federal Government. I find no evidence that Congress intended such a double standard to apply, and I would not lightly impute such an intent to the 1925 Congress which enacted the Arbitration Act.

A state policy excluding wage claims from arbitration, cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Ware*, 414 U. S. 117 (1973), or a state policy of providing special protection for franchisees, such as that expressed in California's Franchise Investment Law, can be recognized without impairing the basic purposes of the federal statute. Like the majority of the California Supreme Court, I am not persuaded that Congress intended the pre-emptive effect of this statute to be "so unyielding as to require enforcement of an agreement to arbitrate a dispute over the application of a regulatory statute which a state legislature, in conformity with analogous federal policy, has decided should be left to judicial enforcement." App. to Juris. Statement 18a.

Thus, although I agree with most of the Court's reasoning and specifically with its jurisdictional holdings, I respectfully dissent from its conclusion concerning the enforceability of the arbitration agreement. On that issue, I would affirm the judgment of the California Supreme Court.

JUSTICE O'CONNOR, with whom JUSTICE REHNQUIST joins, dissenting.

Section 2 of the Federal Arbitration Act (FAA) (also known as the United States Arbitration Act) provides that a written arbitration agreement "shall be valid, irrevocable,

and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[1]   Section 2 does not, on its face, identify which judicial forums are bound by its requirements or what procedures govern its enforcement. The FAA deals with these matters in §§ 3 and 4.   Section 3 provides:

> "If any suit or proceeding be brought *in any of the courts of the United States* upon any issue referable to arbitration . . . the court . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ."[2]

Section 4 specifies that a party aggrieved by another's refusal to arbitrate

> "may petition *any United States district court* which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . ."[3]

Today, the Court takes the facial silence of § 2 as a license to declare that state as well as federal courts must apply § 2. In addition, though this is not spelled out in the opinion, the Court holds that in enforcing this newly discovered federal right state courts must follow procedures specified in § 3. The Court's decision is impelled by an understandable desire to encourage the use of arbitration, but it utterly fails to rec-

---

[1] 9 U. S. C. § 2.

[2] 9 U. S. C. § 3 (emphasis added).

[3] 9 U. S. C. § 4 (emphasis added).   Section 9, which addresses the enforcement of arbitration awards, is also relevant.   "If no court is specified in the agreement of the parties, then such application may be made to the *United States court in and for the district within which such award was made.* . . ."   9 U. S. C. § 9 (emphasis added).

ognize the clear congressional intent underlying the FAA. Congress intended to require federal, not state, courts to respect arbitration agreements.

## I

The FAA was enacted in 1925. As demonstrated *infra*, at 24–29, Congress thought it was exercising its power to dictate either procedure or "general federal law" in federal courts. The issue presented here is the result of three subsequent decisions of this Court.

In 1938 this Court decided *Erie R. Co.* v. *Tompkins*, 304 U. S. 64. *Erie* denied the Federal Government the power to create substantive law solely by virtue of the Art. III power to control federal-court jurisdiction. Eighteen years later the Court decided *Bernhardt* v. *Polygraphic Co.*, 350 U. S. 198 (1956). *Bernhardt* held that the duty to arbitrate a contract dispute is outcome-determinative—*i. e.* "substantive"—and therefore a matter normally governed by state law in federal diversity cases.

*Bernhardt* gave rise to concern that the FAA could thereafter constitutionally be applied only in federal-court cases arising under federal law, not in diversity cases.[4] In *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U. S. 395, 404–405 (1967), we addressed that concern, and held that the FAA may constitutionally be applied to proceedings in a federal diversity court.[5] The FAA covers only contracts involving interstate commerce or maritime affairs, and Congress "plainly has power to legislate" in that area. *Id.*, at 405.

---

[4] Justice Frankfurter made precisely this suggestion in *Bernhardt*. 350 U. S., at 208 (concurring opinion).

[5] Two Circuits had previously addressed the problem. *Robert Lawrence Co.* v. *Devonshire Fabrics, Inc.*, 271 F. 2d 402 (CA2 1959), cert. dism'd pursuant to stipulation of counsel, 364 U. S. 801 (1960); *American Airlines, Inc.* v. *Louisville & Jefferson County Air Bd.*, 269 F. 2d 811 (CA6 1959).

Nevertheless, the *Prima Paint* decision "carefully avoided any explicit endorsement of the view that the Arbitration Act embodied substantive policies that were to be applied to all contracts within its scope, whether sued on in state or federal courts." P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 731–732 (2d ed. 1973).[6] Today's case is the first in which this Court has had occasion to determine whether the FAA applies to state-court proceedings. One statement on the subject did appear in *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1 (1983), but that case involved a federal, not a state, court proceeding; its dictum concerning the law applicable in state courts was wholly unnecessary to its holding.

## II

The majority opinion decides three issues. First, it holds that § 2 creates federal substantive rights that must be enforced by the state courts. Second, though the issue is not raised in this case, the Court states, *ante*, at 15–16, n. 9, that § 2 substantive rights may not be the basis for invoking federal-court jurisdiction under 28 U. S. C. § 1331. Third, the Court reads § 2 to require state courts to enforce § 2 rights using procedures that mimic those specified for federal courts by FAA §§ 3 and 4. The first of these conclusions is unquestionably wrong as a matter of statutory construction; the second appears to be an attempt to limit the damage done by the first; the third is unnecessary and unwise.

---

[6] In *Robert Lawrence, supra,* the Second Circuit had flatly announced—in dictum, of course—that the FAA was "a declaration of national law equally applicable in state or federal courts." 271 F. 2d, at 407. One Justice in *Prima Paint* was prepared to adopt wholesale the Second Circuit's more broadly written opinion. 388 U. S., at 407 (Harlan, J., concurring). But the *Prima Paint* majority opinion did not do so. In these circumstances, the majority opinion speaks loudly by its complete silence regarding the Act's applicability to state courts.

## A

One rarely finds a legislative history as unambiguous as the FAA's. That history establishes conclusively that the 1925 Congress viewed the FAA as a procedural statute, applicable only in federal courts, derived, Congress believed, largely from the federal power to control the jurisdiction of the federal courts.

In 1925 Congress emphatically believed arbitration to be a matter of "procedure." At hearings on the Act congressional Subcommittees were told: "The theory on which you do this is that you have the right to tell the Federal courts how to proceed."[7] The House Report on the FAA stated: "Whether an agreement for arbitration shall be enforced or not is a question of procedure . . . ."[8] On the floor of the House Congressman Graham assured his fellow Members that the FAA

> "does not involve any new principle of law except to provide a simple method . . . in order to give enforcement.
> . . . It creates no new legislation, grants no new rights, except a remedy to enforce an agreement in commercial contracts and in admiralty contracts."[9]

---

[7] Arbitration of Interstate Commercial Disputes, Joint Hearings on S. 1005 and H. R. 646 before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess., 17 (1924) (hereinafter Joint Hearings) (statement of Mr. Cohen, American Bar Association). See also Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal Commercial Arbitration, Hearing on S. 4213 and S. 4214 before a Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 2 (1923) (hereinafter Senate Hearing).

[8] H. R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924). To similar effect, the Senate Report noted that the New York statute, after which the FAA was patterned, had been upheld against constitutional attack the previous year in *Red Cross Line* v. *Atlantic Fruit Co.*, 264 U. S. 109 (1924). S. Rep. No. 536, 68th Cong., 1st Sess., 3 (1924). In *Red Cross* Justice Brandeis based the Court's approval of the New York statute on the fact that the statute effected no change in the substantive law.

[9] 65 Cong. Rec. 1931 (1924).

A month after the Act was signed into law the American Bar Association Committee that had drafted and pressed for passage of the federal legislation wrote:

> "The statute establishes a procedure in the Federal courts for the enforcement of arbitration agreements. . . . A Federal statute providing for the enforcement of arbitration agreements does relate solely to procedure of the Federal courts. . . . [W]hether or not an arbitration agreement is to be enforced is a question of the law of procedure and is determined by the law of the jurisdiction wherein the remedy is sought. That the enforcement of arbitration contracts is within the law of procedure as distinguished from substantive law is well settled by the decisions of our courts." [10]

Since *Bernhardt*, a right to arbitration has been characterized as "substantive," and that holding is not challenged here. But Congress in 1925 did not characterize the FAA as this Court did in 1956. Congress *believed* that the FAA established nothing more than a rule of procedure, a rule therefore applicable only in the federal courts. [11]

If characterizing the FAA as procedural was not enough, the draftsmen of the Act, the House Report, and the early commentators all flatly stated that the Act was intended to affect only federal-court proceedings. Mr. Cohen, the American Bar Association member who drafted the bill, assured two congressional Subcommittees in joint hearings:

> "Nor can it be said that the Congress of the United States, *directing its own courts* . . . , would infringe upon

---

[10] Committee on Commerce, Trade and Commercial Law, The United States Arbitration Law and Its Application, 11 A. B. A. J. 153, 154–155 (1925). See also Cohen & Dayton, The New Federal Arbitration Law, 12 Va. L. Rev. 265, 275–276 (1926).

[11] That Congress chose to apply the FAA only to proceedings related to commercial and maritime contracts does not suggest that the Act is "substantive." Cf. Fed. Rule Civ. Proc. 81; Fed. Rule Evid. 1101; Fed. Rule Crim. Proc. 54.

the provinces or prerogatives of the States. . . . [T]he question of the enforcement relates to the law of remedies and not to substantive law. The rule must be changed for the jurisdiction in which the agreement is sought to be enforced . . . . There is no disposition therefore by means of the Federal bludgeon to force an individual State into an unwilling submission to arbitration enforcement." [12]

The House Report on the FAA unambiguously stated: "Before [arbitration] contracts could be enforced in the Federal courts . . . this law is essential. The bill declares that such agreements shall be recognized and enforced by the courts of the United States." [13]

Yet another indication that Congress did not intend the FAA to govern state-court proceedings is found in the pow-

---

[12] Joint Hearings 39–40 (emphasis added). "The primary purpose of the statute is to make enforcible *[sic]* in the Federal courts such agreements for arbitration. . . ." *Id.*, at 38 (statement of Mr. Cohen). See also Senate Hearing 2 ("This bill follows the lines of the New York arbitration law, applying it to the fields wherein there is Federal jurisdiction").

[13] H. R. Rep. No. 96, *supra*, at 1. Commentators writing immediately after passage of the Act uniformly reached the same conclusion. The A. B. A. Committee that drafted the legislation wrote: "So far as the present law declares simply the policy of recognizing and enforcing arbitration agreements in the Federal courts it does not encroach upon the province of the individual states." Committee on Commerce, Trade and Commercial Law, *supra*, at 155. See also Cohen & Dayton, *supra*, at 276–277; Baum & Pressman, The Enforcement of Commercial Arbitration Agreements in the Federal Courts, 8 N. Y. U. L. Q. Rev. 428, 459 (1931). Williston wrote: "Inasmuch as arbitration acts are deemed procedural, the United States Act applies only to the federal courts . . . ." 6 S. Williston & G. Thompson, The Law of Contracts 5368 (rev. ed. 1938).

More recent students of the FAA uniformly and emphatically reach the same conclusion. *Prima Paint*, 388 U. S., at 424 (Black, J., dissenting); Note, 73 Harv. L. Rev. 1382 (1960); Note, Erie, Bernhardt, and Section 2 of the United States Arbitration Act: A Farrago of Rights, Remedies, and a Right to a Remedy, 69 Yale L. J. 847, 863 (1960); Note, Scope of the United States Arbitration Act in Commercial Arbitration: Problems in Federalism, 58 Nw. U. L. Rev. 468, 492 (1963).

ers Congress relied on in passing the Act. The FAA might have been grounded on Congress' powers to regulate interstate and maritime affairs, since the Act extends only to contracts in those areas. There are, indeed, references in the legislative history to the corresponding federal powers. More numerous, however, are the references to Congress' pre-*Erie* power to prescribe "general law" applicable in all federal courts.[14] At the congressional hearings, for example: "Congress rests solely upon its power to prescribe the jurisdiction and duties of the Federal courts."[15] And in the House Report:

> "The matter is properly the subject of Federal action. Whether an agreement for arbitration shall be enforced or not is a question of procedure to be determined by the law court in which the proceeding is brought and not one of substantive law to be determined by the law of the forum in which the contract is made. . . ."[16]

Plainly, a power derived from Congress' Art. III control over federal-court jurisdiction would not by any flight of fancy permit Congress to control proceedings in state courts.

---

[14] For my present purpose it is enough to recognize that Congress relied *at least in part* on its Art. III power over the jurisdiction of the federal courts. See *Prima Paint*, 388 U. S., at 405, and n. 13 (majority opinion); *id.*, at 416–420 (Black, J., dissenting).

[15] Joint Hearings 38. See also *id.*, at 17, 37–38.

[16] H. R. Rep. No. 96, *supra* n. 8, at 1. Immediately after the FAA's enactment the A. B. A. drafters of the Act wrote:

"[The FAA] rests upon the constitutional provision by which Congress is authorized to establish and control inferior Federal courts. So far as congressional acts relate to the procedure in the Federal courts, they are clearly within the congressional power." Committee on Commerce, Trade and Commercial Law, *supra* n. 10, at 156.

Numerous other commentators writing shortly after the FAA's passage, as well as more recently, have made similar statments. See, *e. g.*, Cohen & Dayton, *supra* n. 10, at 275; Baum & Pressman, *supra*, at 430–431; Note, 73 Harv. L. Rev., at 1383; Note, 58 Nw. U. L. Rev., at 481.

The foregoing cannot be dismissed as "ambiguities" in the legislative history. It is accurate to say that the entire history contains only one ambiguity, and that appears in the single sentence of the House Report cited by the Court *ante*, at 12–13. That ambiguity, however, is definitively resolved elsewhere in the same House Report, see *supra*, at 27, and throughout the rest of the legislative history.

## B

The structure of the FAA itself runs directly contrary to the reading the Court today gives to §2. Sections 3 and 4 are the implementing provisions of the Act, and they expressly apply only to federal courts. Section 4 refers to the "United States district court[s]," and provides that it can be invoked only in a court that has jurisdiction under Title 28 of the United States Code. As originally enacted, §3 referred, in the same terms as §4, to "courts [or court] of the United States."[17] There has since been a minor amendment in §4's phrasing, but no substantive change in either section's limitation to federal courts.[18]

---

[17] The use of identical language in both sections was natural: §3 applies when the party resisting arbitration initiates the federal-court action; §4 applies to actions initiated by the party seeking to enforce an arbitration provision. Phrasing the two sections differently would have made no sense.

[18] In 1954, as a purely clerical change, Congress inserted "United States district court" in §4 as a substitute for "court of the United States." Both House and Senate Reports explained: "'United States district court' was substituted for 'court of the United States' because, among Federal courts, such a proceeding would be brought only in a district court." H. R. Rep. No. 1981, 83d Cong., 2d Sess., 8 (1954); S. Rep. No. 2498, 83d Cong., 2d Sess., 9 (1954).

Even without this history, §3's "courts of the United States" is a term of art whose meaning is unmistakable. State courts are "in" but not "of" the United States. Other designations of federal courts as the courts "of" the United States are found, for example, in 28 U. S. C. §2201 (1976 ed., Supp. V) (declaratory judgments); Fed. Rule Evid. 501; and the Norris-La Guardia Act, 29 U. S. C. §104, see *Boys Markets, Inc.* v. *Retail Clerks*,

30

None of this Court's prior decisions has authoritatively construed the Act otherwise. It bears repeating that both *Prima Paint* and *Moses H. Cone* involved *federal-court* litigation. The applicability of the FAA to state-court proceedings was simply not before the Court in either case. Justice Black would surely be surprised to find either the majority opinion or his dissent in *Prima Paint* cited by the Court today, as both are, *ante*, at 11, 12. His dissent took pains to point out:

> "The Court here does not hold . . . that the body of federal substantive law created by federal judges under the Arbitration Act is required to be applied by state courts. A holding to that effect—which the Court seems to leave up in the air—would flout the intention of the framers of the Act." 388 U. S., at 424 (footnotes omitted).

Nothing in the *Prima Paint* majority opinion contradicts this statement.

The *Prima Paint* majority gave full but precise effect to the original congressional intent—it recognized that notwithstanding the intervention of *Erie* the FAA's restrictive focus on maritime and interstate contracts permits its application in federal diversity courts. Today's decision, in contrast, glosses over both the careful crafting of *Prima Paint* and the historical reasons that made *Prima Paint* necessary, and gives the FAA a reach far broader than Congress intended.[19]

---

398 U. S. 235, 247 (1970) (BRENNAN, J.). References to state and federal courts together as courts "in" or "within" the United States are found in the Supremacy Clause ("Judges *in* every state"); 11 U. S. C. § 306 (1982 ed.); 22 U. S. C. § 2370(e)(2); and 28 U. S. C. § 1738. See also W. Sturges, Commercial Arbitrations and Awards § 480, p. 937 (1930).

[19] The Court suggests, *ante*, at 12, that it is unlikely that Congress would have created a federal substantive right that the state courts were not required to enforce. But it is equally rare to find a federal substantive right that cannot be enforced in federal court under the jurisdictional grant of 28 U. S. C. § 1331. Yet the Court states, *ante*, at 15–16, n. 9, that the FAA must be so construed. The simple answer to this puzzle is that in 1925 Congress did not believe it was creating a substantive right at all.

## III

Section 2, like the rest of the FAA, should have no application whatsoever in state courts. Assuming, to the contrary, that § 2 *does* create a federal right that the state courts must enforce, state courts should nonetheless be allowed, at least in the first instance, to fashion their own procedures for enforcing the right. Unfortunately, the Court seems to direct that the arbitration clause at issue here must be *specifically* enforced; apparently no other means of enforcement is permissible.[20]

It is settled that a state court must honor federally created rights and that it may not unreasonably undermine them by invoking contrary local procedure. " '[T]he assertion of federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice.' " *Brown* v. *Western R. Co. of Alabama,* 338 U. S. 294, 299 (1949). But absent specific direction from Congress the state courts have always been permitted to apply their own reasonable procedures when enforcing federal rights. Before we undertake to read a set of complex and mandatory procedures into § 2's brief and general language, we should at a minimum allow state courts and legislatures a chance to develop their own methods for enforcing the new federal rights. Some might choose to award compensatory or punitive damages for the violation of an arbitration agreement; some might award litigation costs to the party who remained willing to arbitrate; some might affirm the "validity and enforce-

---

[20] If my understanding of the Court's opinion is correct, the Court has made § 3 of the FAA binding on the state courts. But as we have noted, *supra,* at 29, § 3 by its own terms governs only *federal-court* proceedings. Moreover, if § 2, standing alone, creates a federal right to specific enforcement of arbitration agreements §§ 3 and 4 are, of course, largely superfluous. And if § 2 implicitly incorporates §§ 3 and 4 procedures for making arbitration agreements enforceable before arbitration begins, why not also § 9 procedures concerning venue, personal jurisdiction, and notice for enforcing an arbitrator's award after arbitration ends? One set of procedures is of little use without the other.

ability" of arbitration agreements in other ways. Any of these approaches could vindicate § 2 rights in a manner fully consonant with the language and background of that provision.[21]

The unelaborated terms of § 2 certainly invite flexible enforcement. At common law many jurisdictions were hostile to arbitration agreements. *Kulukundis Shipping Co.* v. *Amtorg Trading Corp.*, 126 F. 2d 978, 982–984 (CA2 1942). That hostility was reflected in two different doctrines: "revocability," which allowed parties to repudiate arbitration agreements at any time before the arbitrator's award was made, and "invalidity" or "unenforceability," equivalent rules[22] that flatly denied any remedy for the failure to honor an arbitration agreement. In contrast, common-law jurisdictions that enforced arbitration agreements did so in at least three different ways—through actions for damages, actions for specific enforcement, or by enforcing sanctions imposed by trade and commercial associations on members who violated arbitration agreements.[23] In 1925 a forum allowing *any one* of these remedies would have been thought to recognize the "validity" and "enforceability" of arbitration clauses.

This Court has previously rejected the view that state courts can adequately protect federal rights only if "such courts in enforcing the Federal right are to be treated as Federal courts and subjected *pro hac vice* to [federal] limitations . . . ." *Minneapolis & St. Louis R. Co.* v. *Bombolis*, 241 U. S. 211, 221 (1916). As explained by Professor Hart:

---

[21] See Note, 69 Yale L. J., at 864–865; Note, 73 Harv. L. Rev., at 1385; Note, 58 Nw. U. L. Rev., at 493.

[22] See J. Cohen, Commercial Arbitration and the Law 53–252 (1918); Sturges, *supra*, §§ 15–17 (discussing "revocability"); *id.*, § 22 (treating as equivalent different courts' declarations that arbitration agreements were "contrary to public policy," "invalid," "not binding upon the parties," "unenforceable," or "void"). See also Note, 73 Harv. L. Rev., at 1384.

[23] See Sturges, *supra*, §§ 22–24.

"The general rule, bottomed deeply in belief in the importance of state control of state judicial procedure, is that federal law takes the state courts as it finds them. . . . Some differences in remedy and procedure are inescapable if the different governments are to retain a measure of independence in deciding how justice should be administered. If the differences become so conspicuous as to affect advance calculations of outcome, and so to induce an undesirable shopping between forums, the remedy does not lie in the sacrifice of the independence of either government. It lies rather in provision by the federal government, confident of the justice of its own procedure, of a federal forum equally accessible to both litigants." [24]

In summary, even were I to accept the majority's reading of § 2, I would disagree with the Court's disposition of this case. After articulating the nature and scope of the federal right it discerns in § 2, the Court should remand to the state court, which has acted, heretofore, under a misapprehension of federal law. The state court should determine, at least in the first instance, what procedures it will follow to vindicate the newly articulated federal rights. Cf. *Missouri ex rel. Southern R. Co.* v. *Mayfield,* 340 U. S. 1, 5 (1950).

## IV

The Court, *ante,* at 15–16, rejects the idea of requiring the FAA to be applied only in federal courts partly out of concern with the problem of forum shopping. The concern is unfounded. Because the FAA makes the federal courts equally accessible to both parties to a dispute, no forum shopping would be possible even if we gave the FAA a construc-

---

[24] Hart, The Relations Between State and Federal Law, 54 Colum. L. Rev. 489, 508 (1954). See generally P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 567–573 (2d ed. 1973).

tion faithful to the congressional intent. In controversies involving incomplete diversity of citizenship there is simply no access to federal court and therefore no possibility of forum shopping. In controversies *with* complete diversity of citizenship the FAA grants federal-court access equally to both parties; no party can gain any advantage by forum shopping. Even when the party resisting arbitration initiates an action in state court, the opposing party can invoke FAA § 4 and promptly secure a federal-court order to compel arbitration. See, *e. g.*, *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1 (1983).

Ironically, the FAA was passed specifically to rectify forum-shopping problems created by this Court's decision in *Swift* v. *Tyson*, 16 Pet. 1 (1842).[25] By 1925 several major commercial States had passed state arbitration laws, but the federal courts refused to enforce those laws in diversity cases.[26] The drafters of the FAA might have anticipated *Bernhardt* by legislation and required federal diversity courts to adopt the arbitration law of the State in which they sat. But they deliberately chose a different approach. As was pointed out at congressional hearings,[27] an additional goal of the Act was to make arbitration agreements enforceable even in federal courts located in States that had no arbitration law. The drafters' plan for maintaining reasonable harmony between state and federal practices was not to bludgeon States into compliance, but rather to adopt a uniform federal law, patterned after New York's path-breaking state statute,[28] and simultaneously to press for passage of coordi-

---

[25] See Joint Hearings 16 (statement of Mr. Cohen, A. B. A.); Senate Hearing 2. See also Cohen & Dayton, *supra* n. 10, at 275–276; Sturges & Murphy, Some Confusing Matters Relating to Arbitration under the United States Arbitration Act, 17 Law & Contemp. Prob. 580, 590 (1952).

[26] See, *e. g.*, *Atlantic Fruit Co.* v. *Red Cross Line*, 276 F. 319 (SDNY 1921), aff'd, 5 F. 2d 218 (CA2 1924); *Lappe* v. *Wilcox*, 14 F. 2d 861 (NDNY 1926).

[27] Joint Hearings 35.

[28] See S. Rep. No. 536, *supra* n. 8, at 3.

nated state legislation. The key language of the Uniform Act for Commercial Arbitration was, accordingly, identical to that in § 2 of the FAA.[29]

In summary, forum-shopping concerns in connection with the FAA are a distraction that does not withstand scrutiny. The Court ignores the drafters' carefully devised plan for dealing with those problems.

## V

Today's decision adds yet another chapter to the FAA's already colorful history. In 1842 this Court's ruling in *Swift* v. *Tyson, supra,* set up a major obstacle to the enforcement of state arbitration laws in federal diversity courts. In 1925 Congress sought to rectify the problem by enacting the FAA; the intent was to create uniform law binding only in the federal courts. In *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), and then in *Bernhardt Polygraphic Co.,* 350 U. S. 198 (1956), this Court significantly curtailed federal power. In 1967 our decision in *Prima Paint* upheld the application of the FAA in a *federal-court* proceeding as a valid exercise of Congress' Commerce Clause and admiralty powers. Today the Court discovers a federal right in FAA § 2 that the state courts must enforce. Apparently confident that state courts are not competent to devise their own procedures for protecting the newly discovered federal right, the Court summarily prescribes a specific procedure, found nowhere in § 2 or its common-law origins, that the state courts are to follow.

---

[29] The Uniform Act tracked the "valid, irrevocable, and enforceable" language of § 2. See 47 A. B. A. Rep. 318 (1922). It was also hoped that other States might pattern their arbitration statutes directly after the federal Act. See, *e. g.,* Joint Hearings 28. By 1953 it was reported that arbitration statutes "quite similar" to the FAA had been enacted in 12 other States. Kochery, The Enforcement of Arbitration Agreements in the Federal Courts: Erie v. Tompkins, 39 Cornell L. Q. 74, 76, n. 7 (1953). See also *Ludwig Mowinckels Rederi* v. *Dow Chemical Co.,* 25 N. Y. 2d 576, 584–585, 255 N. E. 2d 774, 778–779 (1970).

Today's decision is unfaithful to congressional intent, unnecessary, and, in light of the FAA's antecedents and the intervening contraction of federal power, inexplicable. Although arbitration is a worthy alternative to litigation, today's exercise in judicial revisionism goes too far. I respectfully dissent.