Ken BOSINGER, dba K–
Tronics, Plaintiff,

v.

PHILLIPS PLASTICS CORPORATION,
a Wisconsin corporation; Does 1
through 20, inclusive, Defendants.

No. 99 CV 946–B–LAB.

United States District Court,
S.D. California.

June 30, 1999.

James J. Warner, San Diego, CA, for plaintiff.

Susanne C. Washington, Rebecca E.W. Wegner, Andrew J. Wronski, James M. Caragher, Foley & Lardner, San Diego, CA, for defendant.

## ORDER GRANTING MOTION TO STAY PENDING ARBITRATION

BREWSTER, Senior District Judge.

### I. Introduction

The Court considers whether it should stay or dismiss the case pending before it based on the arbitration provision contained in the contract between Plaintiff and Defendant. In short, the Court decides the arbitrability of the case.

### II. Background

Plaintiff is Ken Bosinger ("Bosinger"), the sole owner of K–Tronics. Defendant is Phillips Plastics Corp. ("PPC"). Prior to his termination, Bosinger dba K–Tronics acted as the exclusive sales representative for PPC in the San Diego market on an independent contractor basis. Compensation was solely in the form of commissions.

The parties signed the contract in question, one of an apparent series of such agreements, on September 1, 1997. The parties' relationship began in March, 1993. Shortly after this signing, on approximately October 10, 1997, Plaintiff alleges PPC arbitrarily designated certain lucrative accounts he had been working to establish for PPC as "house accounts" for which he was no longer entitled to commission. (Compl.¶ 15–19.) Four months later, PPC notified Bosinger that he would be terminated as its manufacturer's sales representative, and he was terminated on May 3, 1998. (Compl.¶ 16.) Plaintiff alleges that PPC deliberately took these actions to deprive him of commissions resulting from the large volume of sales subsequently made to certain customers. Plaintiff specifically asserts the following causes of action: fraud, breach of contract, breach of the covenant of good faith and fair dealing,

conversion, unfair business practices, unjust enrichment, accounting, and quantum meruit.

Over the course of their relationship, PPC had Bosinger sign approximately fifteen new or amended sales representative agreements. A review of the pleadings indicates that the last, and perhaps last two, of these agreements contained an arbitration clause, requiring that "[a]ny dispute, controversy, or claim *arising out of* or *relating* to this Agreement or the relationship between the parties shall be settled by binding arbitration in accordance with the rules of the American Arbitration Association ("AAA")." (Emphasis added.) Defendant PPC argues that the clause mandates that this Court dismiss, or, at minimum, stay this litigation until the parties have taken their dispute to arbitration.

In his Complaint, Bosinger claims that his signature on the agreement at issue was the result of coercion from PPC. In particular, Plaintiff notes: "The agreements or amendments were usually forced upon K–TRONICS weeks before a substantial client contracted with PPC." (Compl.¶ 11.) Plaintiff also disputes the applicability of this arbitration agreement on the basis that the agreement(s) are illusory and void on their face because PPC could avoid paying commissions by the simple means of designating an account a "house account." (Compl.¶ 14.)

### III. Jurisdiction

The Court first considers its jurisdiction. This case was removed to federal court by Defendant on the grounds of diversity jurisdiction. *See* 28 U.S.C. §§ 1332, 1441. However, the Complaint does not allege a specific amount in controversy. Thus, the Court must first consider whether the amount in controversy requirement contained in Section 1332 is met.

█ The party seeking to invoke the jurisdiction of the federal courts has the burden of proving the existence of jurisdiction, *see NcNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct.

780, 80 L.Ed. 1135 (1936), and the burden of proof in removal cases is on the defendant. *See Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97, 42 S.Ct. 35, 66 L.Ed. 144 (1921); *Gaus v. Miles, Inc.*, 980 F.2d 564, 566–67 (9th Cir.1992) (per curiam) ("[T]he defendant bears the burden of actually proving the facts to support jurisdiction, including the jurisdictional amount."). The removal statute is strictly construed against removal jurisdiction. *See Boggs v. Lewis*, 863 F.2d 662, 663 (9th Cir.1988). "[I]n cases where a plaintiff's state court complaint does not specify a particular amount of damages, the removing defendant bears the burden of establishing, by a preponderance of the evidence, that the amount in controversy exceeds [$75,000]." *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir.1996). The burden is one of "actually proving the facts to support jurisdiction." *Gaus*, 980 F.2d at 567.

█ Defendant asserts only that "Plaintiff is seeking damages in excess of the amount of $75,000, exclusive of interest and costs. Although no dollar amount appears on the face of the Complaint, plaintiff has indicated in writing that he values his claim against defendant at almost $2,000,000.00." (Notice of Removal, ¶ 6(b).) Without submitting an affidavit or documents to support that allegation, the allegation verges on the conclusory.

█ In the situation where a defendant does not meet its burden of proof, a federal court has several options. It may either: "(1) look to the petition for removal, (2) make an independent appraisal of the amount of the claim, or suggest that the defendant is free to do so, or (3) remand the action." *Chapman v. Powermatic, Inc.*, 969 F.2d 160, 163 n. 6 (5th Cir.1992). Ninth Circuit case law suggests that a district court may follow either options (2) or (3). In *Gaus*, involving the same basic fact pattern in the instant matter, the court enunciated a standard that imposed a strict requirement on a defendant to

prove that the amount in controversy was satisfied. With a plaintiff not alleging an amount of damages in his or her complaint, the defendant must *actually* prove the facts supporting the jurisdictional basis for removal. *Id.* at 567. Simple allegations—i.e., "the amount in controversy exceeds $75,000"—are insufficient; instead, the underlying facts supporting removal must be stated in the removal notice itself. *Id.* With only a conclusory statement regarding amount before it, the *Gaus* court vacated defendants' judgment and remanded the matter to the district court with instructions to remand the case to the state court.

■ This case is not *Gaus.* Here, as noted, Defendant does point to—though does not provide—specific evidence upon which bases its conclusion that the amount in controversy exceeds $75,000. The better practice would be to submit an affidavit or documentary evidence of this belief with the notice of removal. However, as such evidence may not always be available to a removing defendant, to require such proof might defeat removal in an instance where a plaintiff declined to plead a specific amount of damages and a defendant could not readily ascertain the approximate amount of damages a plaintiff seeks within thirty days. Moreover, while it is for the Court to decide its own jurisdiction, the Court finds in Plaintiff's silence implicit support for Defendant's allegation as to the amount in controversy.

Finally, the Court finds that this case was properly removed based on its review of Plaintiff's Complaint, one of the options stated above. *See Sanchez,* 102 F.3d at 404–406 (reviewing allegations in complaint and assessing damages available under state law). Plaintiff pleads both tort and contract damages. The Complaint alleges sales "resulting in millions of dollars of business to PPC." Plaintiff does not provide his commission percentage. However, even the most modest of commissions on sales of this volume would give the Plaintiff substantial contract damages.

Tort damages might be higher. The Court also notes that Plaintiff seeks punitive damages for his tort claims. If the allegations as presented prove true, damages may easily exceed the jurisdictional requirement.

Based on the above reasoning, the Court finds it has jurisdiction in this matter.

## IV. Arbitration

### A. Standard of Law

This case is governed by the Federal Arbitration Act (FAA), *see* 9 U.S.C. § 2, which empowers federal courts to stay actions subject to an arbitration agreement and to order a refusing party to abide by the procedures in the agreement. *See* 9 U.S.C. §§ 3, 4; *see also Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The language of Section 3 is mandatory:

> If any suit or proceeding be brought in any of the courts of the United States upon an issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement....

*See also Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (requiring rigorous enforcement of agreements to arbitrate). Dismissal of a case involving a broad arbitration agreement may also be appropriate in certain instances. *See Sparling v. Hoffman Constr. Co.,* 864 F.2d 635, 638 (9th Cir.1988); *Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir. 1992).

■ The Supreme Court has set forth a two-step analysis that courts should consider when deciding whether to enforce an arbitration agreement. "The first task of

a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).[1] A court should make this decision by "applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [Federal Arbitration] Act.'" *Id.* (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 14, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *Southland Corp. v. Keating*, 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *Bayma v. Smith Barney, Harris Upham and Co., Inc.*, 784 F.2d 1023, 1025 (9th Cir.1986).[2] When deciding whether the parties agreed to arbitrate a certain matter courts generally should apply ordinary state-law principles that govern the formation of contracts. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). A court "will not ordinarily except a controversy from coverage of a valid arbitration clause unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Marchese v. Shearson Hayden Stone, Inc.*, 734 F.2d 414, 419 (9th Cir. 1984) (quotation omitted). A court must also take into account the strong federal policy favoring enforcement of agreements to arbitrate, resolving any doubts concerning the scope of arbitrable issues in favor of arbitration. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). *See also Southland Corp.*, 465 U.S. at 7, 104 S.Ct. 852 (expressing policy reasons for preferring arbitration); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (noting congressional purpose to avoid delay and expense of litigation behind the Federal Arbitration Act).

## B. Arbitrability

### 1. The Arbitration Clause

#### a. *Waiver*

 To determine if Plaintiff may be compelled to arbitrate his claims against Defendant PPC, the first question that must be addressed is whether, by signing the Agreement, Plaintiff consented to and is bound by the arbitration clause contained in paragraph 5 of the form. Plaintiff does not dispute that he signed the Agreement at issue. Instead, he claims that he did not knowingly waive his right to a jury trial. However, the case law cited by Plaintiff is unavailing to his position. Plaintiff contends that the Supreme Court has recently decided "that agreements to arbitrate must meet strict contractual scrutiny. The waiver of one's right to litigate disputes in a public forum must be 'clear and unmistakable.'" (quoting *Wright v. Universal Maritime Servs.*, 525 U.S. 70, 119 S.Ct. 391, 396, 142 L.Ed.2d 361 (1998)). Plaintiff misreads *Wright* and the law of arbitrability pertinent to this dispute. First, in *Wright*, while the Court reiterated the presumption of arbitrability under the FAA, it declined to apply the FAA to the case. *Id.* at 395 n. 1. Second, *Wright* involved arbitrability under a collective bargaining agreement, and thus did not involve a statute at issue in the instant matter. Last, and most important, the "clear and unmistakable" waiver language in *Wright* referred not to an agreement to arbitrate generally, but an agreement to allow an

---

1. The second step of this inquiry, discussed below, is to determine whether the claims at issue are within any category of claims or contracts that courts have held unenforceable. *Mitsubishi*, 473 U.S. at 627, 105 S.Ct. 3346.

2. *Bayma* states in full: "The clear teaching of the Supreme Court is that 9 U.S.C. § 2 (1982) does not permit state law to carve out exceptions from the arbitration merely because the state may prefer to have its citizens present their controversies in the court system. If the contact is one 'involving commerce,' then the question of arbitrability is controlled by federal law and not by state law."

arbitrator—at possible expense of one's day in court—to interpret the meaning of a federal statute. Indeed, the *Wright* Court noted that the "clear and unmistakable" standard was not applicable with an individual's waiver of his or her own rights. *Id.* at 397. *Wright* being not applicable, and no "clear and unmistakable" waiver being required, the Court finds that Plaintiff properly waived his right to a judicial forum upon signing the Agreement.

Moreover, the Court finds much of Plaintiff's protestations regarding waiver unconvincing. Plaintiff argues:

> The circumstances in which the Sales Representative Agreement was presented do not lead to the conclusion that Bosinger consented to arbitration. He did not prepare the agreement. Phillips was the exclusive drafter. No discussions took place concerning the provisions of the agreement. The arbitration clause was not discussed in any way. Bosinger was not made aware of the consequences of the arbitration provision (i.e. that he gave up his 7th Amendment right to a trial by jury of any dispute that he may have with Phillips). The agreement was the last in a long line of agreements that Phillips had Bosinger sign. (Opp'n., p. 4–5.)

On their face, these reasons are not sufficient to deny enforceability of the arbitration provision. Lacking in Plaintiff's Declaration are statements that he did not read or sign the agreement, or was not

allowed to so do. That Plaintiff somehow was unaware of the consequences of his arbitration agreement is not relevant. *See Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 287 (9th Cir.1988). Unless he requests the Court to imply something akin to incapacity, the Court presumes his competence and his ability to inform himself prior to signature of the ramifications stemming from his contract.

b. *Duress*

Plaintiff's better argument is his quasi-duress claim. Plaintiff asserts:

> Bosinger was in a very tenuous position when the contract was presented. He had been actively pursuing the business of Qualcomm and Next Level Systems. Each company was interested in purchasing a large volume of Phillips products and services. If Bosinger could solidify a contract, both Phillips and Bosinger stood to be compensated handsomely. Therefore, Bosinger could not afford to begin a dispute with Phillips concerning the Sales Representative Agreement. He simply could not risk losing his income if Phillips decided to terminate his services. (Opp'n, p. 5.)

Combined with the allegation in his Complaint that Plaintiff was presented for his signature a new Agreement—often cutting his commissions—shortly before close of a sale, *see* Compl. ¶ 11, the Court must evaluate whether he freely entered into this contract.[3]

---

3. 3 plaintiff asserts that his Agreement with PPC is a contract of adhesion. But that is an exercise in mislabeling. First, adhesion contracts are most often found in the consumer context. Next, the case Plaintiff cites to support his proposition, *Prudential Ins. Co. v. Lai*, 42 F.3d 1299 (9th Cir.1994), is inapposite. First, *Lai* is a Title VII case and thus of a different genre than the instant matter. In the Title VII/sexual harassment context, the procedural protections afforded a plaintiff in a court setting as compared to an arbitration setting may be "particularly significant." *Id.* at 1305. Therefore, a plaintiff must have "knowingly agreed to submit such disputes to arbitration." *Id.* Furthermore, the facts of

*Lai* clearly demonstrated that there was no such knowing agreement. The agreement was presented to the plaintiffs under false pretenses, the plaintiffs were not given the opportunity to read the form, and the plaintiffs did not receive the National Association of Security Dealers ("NASD") manual detailing the arbitration clause. Perhaps more important, the Ninth Circuit found that the language of the arbitration clause, even if read, did not adequately describe that it would relate to a sex discrimination claim, and favorably compared the situation to a Seventh Circuit case holding as a matter of law that the NASD manual did not apply to employment

As stated by the Supreme Court, "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" *Mitsubishi Motors,* 473 U.S. at 627, 105 S.Ct. 3346 (quoting 9 U.S.C. § 2). Assuming Plaintiff's allegations to be true, the Court doubts that Plaintiff signed his subsequent Agreements with much enthusiasm. With a sales contract in which one's income is wholly dependent on commissions, the sales agent typically will wish to be a party to the initial contract, i.e., the initial contract is not thrust upon him or her unwillingly, but the sales agent's bargaining power may erode to the point of nothingness at certain moments in the relationship. The agent's vulnerability under the contract will increase the closer he or she comes to closing a sale. Threatened with a take-it-or-leave-it proposition before a sales close, the sales agent is left with a rather Hobbesian choice as to his or her future. The agent may accept the new Agreement—and its newest feature—and hope that his or her accounts are not redesignated "house accounts," commissions not reduced, minimum sales goals increased, and/or he or she is not terminated. On the other hand, the agent may decline to sign the new Agreement and lose all hope of reaping the rewards of his or her invested time and effort, while facing a new job search and having to establish new relationships with new clients. Such a contract, the Defendant's protestations of equality notwithstanding, may lead a court to the conclusion that the contract in question is unconscionable. *See Ellis v. McKinnon Broadcasting Co.,* 18 Cal. App.4th 1796, 1803, 23 Cal.Rptr.2d 80 (1993) ("Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the

parties together with contract terms which are unreasonably favorable to the other party.") (citation omitted). *But see Amer. Software Inc. v. Ali,* 46 Cal.App.4th 1386, 54 Cal.Rptr.2d 477 (applying stricter "shock the conscience" test to determine question of unconscionability).

■■■ The Court's review of the contract indicates that PPC had the power unilaterally to strip away from Bosinger every potential lucrative client he developed to the point of sale by designating such client a "house account," that PPC could unilaterally reduce Bosinger's sales commissions, that Bosinger could be terminated without cause, and that, in the event of termination, PPC could at least partially avoid its obligation to pay commissions on sales made in the 90–day notice period by making the client a house account.[4] The incentive to exercise these contractual rights at Bosinger's expense naturally would increase as Bosinger's sales potential increased, as long as PPC believed that it could close the pending deal *sans* Bosinger. This perverse incentive has been noted by at least one court. *See, e.g., Wakefield v. Northern Telecom., Inc.,* 769 F.2d 109, 112–113 (2d Cir.1985) ("[With commission agreements], an unfettered right to avoid payment of earned commissions in the principal or employer creates incentives counterproductive to the purpose of the contract itself in that the better the performance by the employee, the greater the temptation to terminate.").

However, the above observations notwithstanding, duress arguments must be directed to the arbitration provision specifically, and not the agreement as a whole, to render the arbitration provision inapplicable. *See Prima Paint Corp.,* 388 U.S. at 403–404, 87 S.Ct. 1801 ("[T]he statutory language does not permit the federal court to consider claims of fraud in the induce-

disputes. None of the instant allegations rise to this level.

4. The "house account" provision and the commission reduction provision both provide

for consultation with the sales agent. However, neither of these consultation provisions ultimately restricts PPC's unfettered ability to act as it pleases.

ment of the contract generally."); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140 (9th Cir.1991) ("[A] federal court may consider a defense of fraud in the inducement of a contract only if the fraud relates specifically to the arbitration clause itself and not to the contract generally.") Moreover, *Three Valleys* approvingly quotes the following language from *Rhoades v. Powell*, 644 F.Supp. 645, 653 (E.D.Cal.1986):

> The *Prima Paint* doctrine is not limited, however, to rescission based on fraudulent inducement, but *extends to all challenges to the making of a contract:* 'The teaching of Prima Paint is that a federal court must not remove from the arbitrators consideration of a substantive challenge to a contract unless there has been an independent challenge to the making of the arbitration clause itself.' (Emphasis in original.) [5]

Plaintiff's claim is that the agreement as a totality was forced upon him—as evidenced by his complaints regarding house accounts—and not just the arbitration provision.[6] As noted, Plaintiff's claim is that the agreements or amendments were impressed upon him just prior to concluding a sale for PPC. (Compl.¶ 11.) On these allegations, the Court is constrained to apply the above-cited precedent.

### c. *Tort claims*

■ The Court first notes the breadth of the arbitration clause at issue. In comparison to an arbitration clause utilizing the language "arising out of," which is construed to apply only to a narrow range of disputes specifically relating to the interpretation and performance of the contract at issue, courts interpret an arbitration provision containing the language "arising out of and or relating to" as a "broad arbitration clause." *See Prima Paint*, 388 U.S. at 398, 87 S.Ct. 1801; *Mediterranean Enterprises, Inc.*, 708 F.2d at 1464; *Sweet Dreams Unlimited v. Dial-A-Mattress Intern.*, 1 F.3d 639, 642 (7th Cir.1993) ("We find, however, that 'arising out of' reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se.... In fact, any dispute between contracting parties that is in any way connected with their contract could be said to 'arise out of' their agreement and thus be subject to arbitration under a provision employing this language. At the very least, an 'arising out of' arbitration clause would 'arguably cover' such disputes, and, under our cases, this is all that is needed to trigger arbitration.") (modifications omitted).

According to Defendant, each of Plaintiff's claims alleges entitlement to damages entirely stemming from the parties' relationship. Accordingly, Defendant argues that the arbitration language is broad enough to encompass arbitration on Plaintiff's tort claims. Defendant's position is supported in the case law. Fraud in the inducement and economic duress of the Agreement as a whole are questions for the arbitrator. *See Prima Paint*, 388 U.S. at 403–04, 87 S.Ct. 1801; *Sparling*, 864 F.2d at 638 ("fraud claims must be submitted to arbitration unless the arbitration clause itself was fraudulently induced."); *Kroll v. Doctor's Associates, Inc.*, 3 F.3d 1167, 1170 (7th Cir.1993) ("[A] plaintiff may not avoid an otherwise valid arbitration provision merely by casing its complaint in tort. The touchstone of arbitrability in such situations is the relationship of the tort alleged to the subject matter of the arbitration clause.... [T]he fraud

---

**5.** *Three Valleys* also cites with approval *Hall v. Prudential–Bache Sec., Inc.*, 662 F.Supp. 468, 471 n. 1 (C.D.Cal.1987) ("Claims concerning duress, unconscionability, coercion, or confusion in signing should be determined by an arbitrator."), a case that would appear to cover the implied issues in this instant matter.

**6.** The Court also notes that this last contract may not be the first contract to contain the disputed arbitration provision. Defendant asserts that Plaintiff signed a similar contract in 1996. (Reply, p. 7 n. 3.)

claims asserted here are arbitrable because they are directly related to the agreements themselves.").

In light of the arbitration clause's broad wording and the direct relationship of Plaintiff's claims to the contract at issue, the Court finds that the arbitration clause requires that Plaintiff present his complaint to arbitration.

## 2. Enforceability of the Contract

If the above-stated observations regarding Defendant's contractual latitude are correct, the contract at issue may very well be illusory and thus lacking in mutuality of obligation so as to be unenforceable as a matter of law. But that is a determination that can be placed in issue and decided in the arbitration proceeding. The presence of that issue does not preempt the otherwise apparently valid arbitration clause.

### III. Conclusion

Upon review of the pleadings, the Motion to Stay Pending Arbitration is GRANTED and this action is stayed.[7] The Court sets a status hearing for January 10, 2000 unless the case is dismissed at an earlier date.

IT IS SO ORDERED.

---

7. The Court declines to dismiss the action. While the Ninth Circuit apparently finds it permissible that a district court dismiss rather than stay—as provided for in the Act—an action, the cases so holding provide little guidance as to when dismissal should be chosen over a stay. Other authority so allowing, *see Alford, supra,* 975 F.2d at 1164, does so on the logic that staying an action when all the issues raised are arbitrable and must be submitted to arbitration would serve "no purpose." Perhaps that may be true, although either party may ask a court to review the arbitrator's award or lack thereof based on the defenses set forth at 9 U.S.C. §§ 9–12. More important, the clear language of Section 3 mandates a stay and not dismissal. Without better guidance from this Circuit, the Court chooses to rely on the clear statutory language.