**Linda METCALF, et al., Plaintiffs,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., et al., Defendants.**

**No. 11–cv–127.**

United States District Court, M.D. Pennsylvania.

March 9, 2011.

---

Maxwell S. Kennerly, The Beasley Firm, LLC, Philadelphia, PA, for Plaintiffs.

William E. Mahoney, Jr., William T. Mandia, Stradley, Ronon, Stevens & Young, Philadelphia, PA, Scott N. Pletcher, Law Offices of Scott N. Pletcher, State College, PA, for Defendants.

### *MEMORANDUM and ORDER*

JOHN E. JONES III, District Judge.

Presently before the Court are two pending motions to compel arbitration (Docs. 32, 36) and a motion to stay proceedings, including discovery, pending ruling on the motion for summary judgment to compel arbitration. (Doc. 43). For the reasons that follow, the two motions to compel arbitration will be granted and the motion to stay proceedings pending ruling on the motion for summary judgment to compel arbitration will be denied as moot. The Court will order the parties to pro-

ceed to appropriate arbitration, and this action will be stayed pending those proceedings.

## I. FACTUAL BACKGROUND and PROCEDURAL HISTORY

On August 17, 2009, Plaintiffs Linda Metcalf, ("Metcalf"), Michelle Hartly, ("Hartly"), Filmwest Productions, LLC, ("FW"), Sunwest Capital Management, Inc., ("SCM"), and Do You Know Where Your Parents Are, LLC, ("Parents LLC") (collectively "Plaintiffs"), filed a complaint in the Eastern District of Pennsylvania against Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., ("Merrill Lynch"), Lawrence R. Bellmore, Jr., ("Bellmore"), Solar Wind Productions, LLC, ("SWP"), Michael Jacobs, Ruby Handler–Jacobs, (the "Jacobs"), and Rio Grande Studios, LLC.[1] (Doc. 1). Specifically, Plaintiffs assert claims against Defendants for violations of the following: (1) Count I: Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968; (2) Count II: Fraud; (3) Count III: Conversion; (4) Count IV: Conspiracy; (5) Count V: Breach of Fiduciary Duty against Bellmore and Merrill Lynch; (6) Count VI: Breach of Fiduciary Duty against Michael Jacobs, Ruby Jacobs and Solar Wind LLC Productions; (7) Count VII: Declaratory Judgment against Solar Wind LLC; and (8) Count VIII: Breach of Contract against Solar Wind LLC, all of which stem from a failed financing agreement to produce a motion picture based on a screenplay known as "Do You Know Where Your Parents Are?" (*Id.*).

Regarding the execution of the Financing Agreement between SWP and FW, the pertinent facts are as follows. Plaintiff Metcalf, a resident of California, is the Vice President of SCM, a corporation registered and with its principal place of business in Nevada, and an investor in the "Do You Know Where Your Parents Are?" film project. (*Id.* ¶ 2). Plaintiff Hartly, also a resident of California, produces feature-length films and is the managing member of FW, an LLC registered in California with its principal place of business in the same state. (*Id.* ¶ 3). Hartly is also a managing member of Parents LLC, registered in California for the purpose of producing a feature-length film. (*Id.*). In October 2008, FW and Metcalf signed a term sheet to produce a film based on the "Do You Know Where Your Parents Are?" screenplay and Metcalf transferred $200,000 to an account controlled by FW. (*Id.* ¶ 9). On January 28, 2009, the Jacobs, who are husband and wife residents of New Mexico and members of SWP, solicited Hartly, Metcalf, FW, and Parents to enter into a joint venture with "SWP Film Fund presented by Rio Grande Studios," a "complicated film financing enterprise."[2]

---

**1.** SWP, Michael Jacobs, Ruby Handler–Jacobs, and Rio Grande Studios, LLC shall also be referred to as the "Jacobs Defendants" throughout the remainder of this memorandum.

**2.** The solicitation materials provided, in part, as follows:
  1. The Producer/Investor deposits the Development Deposit, 10% of the Adjusted Film Budget, into a Film Fund Holding Account established at the Selected Brokerage Firm.
  2. The Producer/Investor is listed as a co-signatory on the holding account.

3. Upon the receipt, by the brokerage firm, the 10% Development Deposit is converted to a Certificate of Deposit or similar instrument (CD) for no less than a 3 month term.
4. The Producer/Investor is listed as a co-signatory on the CD.
5. The Secured Working Capital Line of Credit is obtained against the CD as collateral.
6. The Working Capital Line of Credit is applied to obtain total film financing.
7. Draw down of funds to follow the schedule as approved by the Parties.

(*Id.* ¶¶ 6, 10). The solicitation materials also included information from Merrill Lynch providing instructions for SWP clients, who were not also clients of Merrill Lynch, describing how it would be involved in the film financing through Bellmore. (*Id.* ¶¶ 6, 12).

Plaintiffs contend that "FW did not accept the terms of the March 9" agreement. (Doc. 40 at 4). They also claim that Defendants fraudulently induced Hartly into signing the March 18 version of the agreement. (*Id.*). In order to correct the issues Plaintiffs had with the March 9 version of the Financing Agreement, Plaintiffs forwarded SWP a draft with changes. (*Id.; see also* Ex. 1–a). On March 16, 2009, the Jacobs sent another version of the agreement to Plaintiffs and orally represented that the changes demanded by Plaintiffs had been incorporated. (Doc. 40 at 4, Ex. 1–b). Metcalf, not a signatory to the agreement, allegedly sent two emails identifying a typographical error and highlighting SWP's failure to include the 90 day time line that Plaintiffs made an essential condition of any agreement. (Doc. 40 at 5). The Jacobs then sent another draft of the agreement on March 18, and allegedly represented to Plaintiffs that the changes requested by FW had been made. (*Id.*).

Over the course of a few days from March 16 to March 19, the Jacobs and Bellmore sent numerous emails to Plaintiffs confirming that the procedures in place would ensure that Metcalf's deposit would be placed into an account which she controlled. (*Id.*). Subsequently on March 19, Plaintiffs allege that Defendants, knowing Hartly was scheduled for surgery, rep-

resented that the changes FW requested had been made and asked that Hartly sign the last page and return it. (*Id.*). As a result, Plaintiffs wired $200,000 according to Defendants' instructions, believing that the changes they requested, namely that Metcalf would have sole control over the deposited funds, had been effectuated. (*Id.*). Thereafter, Plaintiffs allegedly learned that Defendants' representations regarding an account with Merrill Lynch were false and the deposit was transferred into SWP's operating account. (*Id.* at 6).

Finally, Plaintiffs contend that the Financing Agreement's terms were drafted almost entirely by Defendants. (*Id.*). Moreover, Plaintiffs assert that due to the uncertain nature of film production, the agreement provided that SWP would have no obligations until the Plaintiffs' deposit is converted into a working line of credit. (*Id.*). Regarding termination of the agreement, Plaintiffs contend that they had the right to terminate the contract unilaterally if SWP failed to secure the funding. (*Id.*). Specifically, they cite paragraph eight which provides:

> Upon termination of this Agreement for any reason, including (without limitation) SWP's failure to secure the requisite FINANCING during the Initial Financing Period, ... all rights granted ... shall immediately and without notice or demand revert to The PRODUCERS, .... Further, DEPOSIT, ... shall be returned to PRODUCERS' bank account (PRODUCER'S wiring information as provided in Subparagraph 13(a) below) no later than 30 days from effective date of termination.

8. In the unlikely event that funding is not delivered within the estimated or reasonable time frame, the CD (Producer's Development Deposit) is returned to the Investor/Depositor.

The solicitation materials also included that the "length of time for deposit return" was "estimated to be a 60–90 day return." (Doc. 1 ¶ 11, *see also* Ex. A).

(*Id.* at 7 (citing Ex. 1–h at 7)). Plaintiffs also argue that the agreement does not provide for survival of the arbitration clause, much less any clause, in the event of termination.

Following a somewhat convoluted procedural path, which involved the filing of approximately six motions, including a Motion to Dismiss (Doc. 10) filed on October 23, 2009, a Motion to Strike, or in the Alternative, to Dismiss the Answer of the Defendants (Doc. 29) filed on January 26, 2010, a Motion for Summary Judgment to Compel Arbitration (Doc. 32) filed on February 9, 2010, a Motion to Compel Arbitration and Stay Proceeding (Doc. 36) filed on February 23, 2010; a Motion to Stay Proceedings (Doc. 43) filed on March 15, 2010; and a Motion to File an Amended Complaint (Doc. 59) on July 7, 2010, none of which were decided, the case was transferred to this Court via an order granting the Joint Motion to Transfer Venue (Doc. 77) on January 13, 2011. (Doc. 78).

On February 1, 2011, we conducted a telephone status conference to aid the Court in discerning the status of the numerous pending motions. Counsel for all parties seemed to agree that a stay of discovery as to the Jacobs Defendants would be appropriate pending resolution of the motion for summary judgment to compel arbitration, but that discovery as to Merrill Lynch should continue. The parties indicated they would attempt to file a stipulation regarding the same by March 1, however, such a stipulation has apparently not materialized.

In response to the Jacobs Defendants' Motion for Summary Judgment to Compel Arbitration (Doc. 32), Plaintiffs filed a brief in opposition (Doc. 40) on March 2, 2010, and Defendants filed a reply brief (Doc. 51) on April 21, 2010. Plaintiffs also filed an opposition brief (Doc. 42) to Defendant Merrill Lynch's Motion to Compel Arbitration and Stay Proceedings (Doc. 36) on March 9, 2010. Regarding the Jacobs Defendants Motion to Stay Proceedings (Doc. 43), Plaintiffs filed a response and brief in opposition on March 29, 2010. (Docs. 46, 47). Therefore, the pending motions have been fully briefed and are ripe for disposition. We will address each motion in turn.

## II. STANDARD

In deciding a motion to compel arbitration, a court applies a standard analogous to that applied to a motion for summary judgment. *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.,* 636 F.2d 51, 54 & n. 9 (3d Cir.1980). Under this standard, "[t]he district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Id.* at 54. "A naked assertion, however, by a party to a contract that it did not intend to be bound by the terms thereof is insufficient to place in issue 'the making of the arbitration agreement' for the purposes of Section 4 of the Federal Arbitration Act." *Id.* at 55.

## III. DISCUSSION

### A. The Jacobs Defendants' Motion for Summary Judgment Compelling Arbitration.

The Court has federal question jurisdiction over this matter under 28 U.S.C. § 1331, in that this action arises under federal law, specifically, the RICO Act. The Court will therefore apply federal law and, because this is an arbitration dispute which involves transactions in interstate commerce, we will apply the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq. State Farm Mut. Auto. Ins. Co. v. Coviello,* 233 F.3d 710, 713 n. 1 (3d Cir.2000).

The FAA provides that "[a] written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In addition, "[t]he FAA establishes a strong federal policy in favor of compelling arbitration over litigation." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001). However, "[t]he liberal policy favoring arbitration agreements is at bottom a policy guaranteeing the enforcement of private contractual arrangements, and under the FAA, a court may only compel a party to arbitrate where that party has entered into a written agreement to arbitrate that covers the dispute." *Id.* "A motion to compel arbitration calls for a two-step inquiry into (1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir.2005).

In the case *sub judice,* the parties do not dispute that the contract between SWP and FW contains a written arbitration clause. Paragraph twenty-one (21) of the SWP/FW Financing Agreement provides the following alternative dispute resolution provision:

> Should any dispute or controversy arise between the PARTIES hereto with reference to this Agreement, the PARTIES shall first attempt to settle such dispute or controversy by voluntary mediation for a period of thirty (30) days in the physical location of Albuquerque, New Mexico. If settlement is not reached, then any and all controversies claims or disputes arising out of or related to this Agreement, or the interpretation, per-

> formance or breach thereof, including, but not limited to alleged violations of local, state or federal statutory or common law rights or duties, and the determination of the scope or applicability of this Agreement to mediate and arbitrate ("Dispute") shall then be resolved solely and exclusively by final and binding arbitration initiated and conducted according to the IFTA Rules and Procedures in effect as of the date hereof, including the Optional Appeal Procedure provided for in such rules (the "Arbitration Rules"). The arbitration shall be conducted in **Albuquerque, New Mexico.** Discovery shall be as permitted by the arbitrator. The prevailing Party therein shall recover from the non-prevailing Party its costs, including reasonable attorney fees.

(Doc. 37, Ex. 1–h).

Taking part two of the two-step inquiry first, it is clear that Plaintiffs' claims fall within the scope of the broad arbitration provision. All of Plaintiffs' claims arise out of conduct related to the Financing Agreement entered into between SWP and FW. (*See* Doc. 1 at 1).

Regarding the first step, the point contested by Plaintiffs is whether a valid arbitration agreement exists. Although Plaintiffs acknowledge the existence of the Financing Agreement and the arbitration provision therein, Plaintiffs contend they were fraudulently induced into entering the agreement. (*See id.*). Defendants cite to the Supreme Court's decision in *Prima Paint v. Flood & Conklin* for the proposition that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of

fraud in the inducement of the contract generally." 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

In further support of their contention, Defendants cite the Supreme Court's decision in *Buckeye Check Cashing v. Cardegna* where the Court stated:

[f]irst, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance. Third, this arbitration law applies in state as well as federal courts.

546 U.S. 440, 445–46, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). They also highlight the Court's reasoning in that case which lead them to conclude that "because respondents challenge the Agreement, but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court." *Id.* Defendants maintain that like the respondents in *Buckeye Check Cashing,* Plaintiffs herein challenge the Financing Agreement in its entirety. (Doc. 33 at 16). Moreover, they assert that because the agreement at issue involves interstate commerce, the FAA governs the dispute. (*Id.*)

Defendants also claim that the Third Circuit has a "strong federal policy in favor of compelling arbitration over litigation." (Doc. 33 at 16 (citing *Sandvik AB v. Advent Int'l Corp.,* 220 F.3d 99, 104 (2000))). They note that negotiations occurred between Plaintiffs Metcalf and Hartly and the Jacobs Defendants concerning the terms of an agreement whereby SWP would provide financing for the film. (*See id.* at 17). Moreover, Defendants maintain that these discussions culminated in the signing of the Financing Agreement on March 16, 2009. (*Id.*). Defendants argue that because Metcalf and Hartly were disclosed agents of their respective organizations, Parents and FW, their relationships are sufficient to bind both organizations to the Financing Agreement's arbitration provision. (*Id.*). Defendants contend that "because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." (*Id.* (citing *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith,* 7 F.3d 1110, 1121 (3d Cir.1993))). Additionally, they cite the Third Circuit's decision in *Isidor Paiewonsky Associates, Incorporated v. Sharp Properties, Incorporated* for the proposition that "arbitration agreements may be upheld against non-parties where the interests of such parties are directly related to, if not congruent with, those of a signatory."

Finally, Defendants argue that the Jacobs Defendants are entitled to rely on the arbitration provision contained in the Financing Agreement. (Doc. 33 at 19). Citing *Medtronic AVE Incorporated v. Advanced Cardiovascular Systems,* Defendants note that in determining whether a claim is covered under an arbitration provision "the focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." 247 F.3d 44, 55 (3d Cir.2001). Furthermore, they contend that because Plaintiffs' claims against the Jacobs and Rio Grande Studios, LLC are "indistinguishable from its claims against SWP" all of Plaintiffs' claims are therefore subject to arbitration. (Doc. 33 at 20).

On the other hand, Plaintiffs claim that Hartly signed the Financing Agreement on March 19 after numerous changes had been made to the original agreement, under the mistaken belief that the changes demanded by the FW Draft 2 had been

incorporated, and believing that the funds would be safely transferred to an account over which Plaintiff Metcalf had exclusive control. (Doc. 40 at 5).

Plaintiffs also argue that New Mexico law should govern interpretation of the Financing Agreement instead of the FAA. (*Id.* at 7). They cite paragraph 24(a) of the Financing Agreement which states "[t]his Agreement shall be construed under the laws of the State of New Mexico applicable to agreements wholly negotiated, entered into and to be performed therein." (Doc. 37, Ex. 1–h). Plaintiffs further contend that the New Mexico Supreme Court has rejected the argument presented in *Buckeye Check Cashing* that the FAA preempts New Mexico state contract law and instead holds that "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]." (Doc. 40 at 8 (citing *Fiser v. Dell Computer Corp.*, 144 N.M. 464, 188 P.3d 1215, 1222 (2008))).

Additionally, Plaintiffs maintain that under federal and New Mexico law, the failure of the parties to come to a "meeting of the minds" is a "dispute over whether any agreement was ever concluded, which is an issue for the courts to decide, not the arbitrator." (Doc. 40 at 8 (citing *Composition Roofers Local 4 Pension Fund v. Best Roofing of N.J., Inc.*, No. 09–5358(SRC), 2009 U.S. Dist. LEXIS 116470, at *5 (D.N.J. Jul. 2, 2009); *Sisneros v. Citadel Broad. Co.*, 140 N.M. 266, 142 P.3d 34 (N.M.Ct.App.2006))). Furthermore, they claim that even if a contract was formed, New Mexico substantive law provides that courts may hear challenges against arbitration clauses beyond mere fraud-in-the-inducement claims. (Doc. 40 at 8–9 (citing *Monette v. Tinsley*, 126 N.M. 748, 975 P.2d 361 (N.M.Ct.App.1999) ("Our Supreme

Court has clearly held that it is for a court to determine issues of fraud in the inducement, not an arbitrator."))).

Next, Plaintiffs claim that the arbitration clause is unenforceable because the agreement was never concluded due to Defendants' misrepresentations. They claim that the Jacobs orally represented to Plaintiffs that subsequent drafts of the Financing Agreement incorporated changes demanded by Plaintiffs, and that Hartly relied on these representations in signing the March 19 agreement. (Doc. 40 at 10). Therefore, Plaintiffs argue that the agreement Defendants seek to enforce herein is materially different from the agreement to which Hartly agreed and "Plaintiff may not be forced to arbitrate unless and until the fact finder resolves these disputes." (*Id.* (citing *Sisneros*, 142 P.3d at 38).)

Plaintiffs also claim that the arbitration clause is not supported by consideration because under New Mexico law "a promise that puts no constraints on what a party may do in the future—in other words, when a promise, in reality, promises nothing—it is illusory, and it is not consideration." (Doc. 40 at 11 (citing *Piano v. Premier Distrib. Co.*, 137 N.M. 57, 107 P.3d 11 (N.M.Ct.App.2004))). Here, Plaintiffs assert, the agreement placed no constraints on what SWP may do in the future until after the deposit was transferred to FFHA, converted to a CD, and subsequently converted to a working line of credit. (*Id.*). Thus, because such transfers never occurred, Plaintiffs argue that the agreement between SWP and FW was illusory. (*Id.* at 11–12).

Furthermore, Plaintiffs argue that the Financing Agreement does not contain a survival clause in the event the contract is terminated. They maintain that because the agreement was terminated, and the arbitration clause does not survive termi-

nation of the agreement, the obligation to arbitrate is unenforceable. (*Id.* at 12). Plaintiffs assert that on May 19, 2009, immediately after discovering the full extent of Defendants' fraud, they terminated the agreement. (*Id.; see also* Ex. 1–j). As noted above, Plaintiffs claim that the Financing Agreement permitted them to terminate the agreement unilaterally for any reason, including the failure of SWP to secure financing. (Doc. 40 at 12).

Finally, Plaintiffs assert that there is no arbitration agreement between Plaintiffs and Defendant Merrill Lynch and likewise no arbitration agreement between Plaintiffs and Defendant Bellmore. (*Id.* at 16). Although, Plaintiffs note, courts recognize that "arbitration agreements may be upheld against non-parties where the interests of such parties are directly related to, if not congruent with, those of a signatory," *see Pritzker v. Merrill Lynch, Pierce, Fenner & Smith,* 7 F.3d 1110, 1114 (3d Cir.Pa.1993), this rule is tempered by basic contract principles holding "that a signatory cannot be bound to arbitrate unless it is bound under traditional principles of contract and agency law to be akin to a signatory of the underlying agreement." *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 194 (3d Cir.2001). Here, they argue, it is unclear that Defendants would be treated as beneficiaries of agreements between Plaintiffs and SWP under traditional principles of contract and agency law. (Doc. 40 at 16). Moreover, they contend that because Plaintiffs would have claims against Merrill Lynch independent from the SWP agreements, the non-signatory Defendants would not fall within the scope of the arbitration provision via principles of contract law or agency principles. (*Id.*).

At the outset, we note that "[i]n deciding motions to compel arbitration, courts are forbidden to address or resolve the underlying merits of the dispute." *Merrill Lynch, Pierce, Fenner & Smith v. Brillman,* No. 90–2732, 1991 WL 1836, at *2 (E.D.Pa. Jan. 8, 1991) (collecting cases). As noted by many federal courts, the FAA established a "strong federal policy in favor of resolving disputes through arbitration." *Invista S.à.r.l. v. Rhodia, SA,* 625 F.3d 75, 83–84 (3d Cir.2010). Moreover, we agree with Defendants' contention that while construction of the Financing Agreement is governed by New Mexico law, (*see* Doc. 37, Ex. 1–h ¶ 20(a)), the application of the FAA in determining whether an agreement to arbitrate exists, and whether the issues are arbitrable, does not require the Court to wade into interpretation of the agreement under New Mexico law. (*See* Doc. 51 at 5). As the Supreme Court stated in *Buckeye Check Cashing v. Cardegna:*

> [f]irst, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance. Third, this arbitration law applies in state as well as federal courts.

546 U.S. at 445–46, 126 S.Ct. 1204.

In addition, we find the Supreme Court's decision in *Prima Paint v. Flood & Conklin* to be particularly relevant in holding that:

> if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. *But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.*"

388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (emphasis added) (*see also Battaglia v. McKendry*, 233 F.3d 720, 725 (3d Cir.2000) ("Where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'") (quoting *AT & T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986))).

Furthermore, we find that Plaintiffs' arguments herein, analogous to those presented in *Buckeye Check Cashing*, challenge the Financing Agreement in its entirety instead of specifically the arbitration clause. *See Buckeye Check Cashing*, 546 U.S. at 445–46, 126 S.Ct. 1204 (noting that "because respondents challenge the Agreement, but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court."). Furthermore, the *Buckeye Check Cashing* Court also recognized that an "arbitration provision is severable from the remainder of the contract" and "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *See id.* Significantly, the Supreme Court also held that the law mentioned above "applies in state as well as federal courts." *See id.* Thus, the arbitration clause herein is severable from the remainder of the Financing Agreement because Plaintiffs fail to challenge the arbitration clause itself.

While we recognize Plaintiffs' argument that "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2" of the FAA, Plaintiffs nevertheless fail to challenge the arbitration clause itself. (*See* Doc. 40 at 7–10 (citing *Fiser v. Dell Computer Corp.*, 144 N.M. 464, 188 P.3d 1215, 1222 (2008) (quoting *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)))). Plaintiffs only arguments concerning fraud or misrepresentation are based on allegations that Defendants failed to incorporate changes Plaintiffs demanded during the parties' negotiations, and that Defendants orally represented that such revisions had been incorporated into subsequent drafts of the Financing Agreement. (Doc. 40 at 10). Despite these contentions, Plaintiffs' allegations fail to identify what changes they demanded concerning the arbitration clause in paragraph 21.

█ In fact, none of the exhibits Plaintiffs attached to their opposition brief include a reference to paragraph 21, the alternative dispute resolution clause, or suggest that the same was the subject of any revisions Plaintiffs requested to the contract. (*See* Doc. 40, Ex. 1). Therefore, while Plaintiffs argue that the Financing Agreement they signed was materially different from the one they expected to sign, they have provided no evidence suggesting they received anything other than what was bargained for as to the arbitration clause. In the absence of such evidence, the fact remains that Plaintiffs signed an agreement which they knew expressly provided for arbitration. To argue that Defendants made misrepresentations about the agreement as a whole in attempting to invalidate the arbitration provision, without specifically alleging misrepresentations or fraud as to the arbitration clause itself, fails to raise a genuine issue of material fact as to whether a valid arbitration

clause existed. *See TMG Health, Inc. v. UnitedHealth Grp, Inc.,* 2007 WL 1258133, at *3, 2007 U.S. Dist. LEXIS 31423, at *8 (Apr. 26, 2007) (noting that in *Par–Knit Mills* "[t]he Third Circuit found that a factual determination is warranted only if there is doubt whether an agreement to arbitrate exists, that is, there must be an unequivocal denial that an agreement had been made and this denial must be supported by affidavits. Where, however, an express and unequivocal agreement to arbitrate exists, a factual determination is not required.").

Plaintiffs have failed to raise a genuine issue of material fact suggesting that the arbitration clause was the subject of fraud, misrepresentation, or a disconnect between the parties in the formation of the Financing Agreement. Moreover, Plaintiffs fail to assert that Defendants made oral misrepresentations that specifically induced Plaintiffs to enter into the arbitration clause itself, as opposed to misrepresentations that caused them to enter into the Financing Agreement as a whole. *See Prima Paint,* 388 U.S. at 403–04, 87 S.Ct. 1801 ("the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.").

■ To the extent Plaintiffs raise the following arguments, namely: (1) that the agreement between SWP and FW was illusory, and (2) that the Financing Agreement does not contain a survival clause in the event the agreement is terminated, we find the foregoing to be unavailing. As noted above, by virtue of substantive federal law the arbitration clause is severable from the rest of the agreement and any deficiencies contained therein, including an alleged lack of consideration. Additionally, the fact that the Financing Agreement does not include a survival clause is of little consequence because the arbitration

clause is severable from the agreement as a whole and challenges against the Financing Agreement that do not specifically challenge the arbitration agreement will not serve to invalidate an unequivocal duty to arbitrate. Allowing either of these deficiencies within the agreement to nullify an arbitration clause made severable from the underlying contract by federal law would undermine Congress' very purpose in enacting the FAA. (*See New Jersey Bldg. Laborers Statewide Benefits Fund v. Am. Coring & Supply,* 341 Fed.Appx. 816, 820 (3d Cir.2009) (citing *Buckeye,* 546 U.S. at 449, 126 S.Ct. 1204) ("Due to the severable nature of an arbitration clause, challenges to arbitrability are reserved for the court, while arguments that attack the contract as a whole must be presented to an arbitrator.")). The Third Circuit in *New Jersey Building* noted that:

> [n]o part of [plaintiff's] argument on this appeal attacks the arbitration clause itself. [Plaintiff] does not argue that the arbitration provision is invalid on its face or that anything in the language of that provision renders it inapplicable to [plaintiff]. Nor does the [plaintiff] company contend that the subject of the dispute, . . ., falls outside of the scope of the arbitration provision.

341 Fed.Appx. at 820. In the same decision, the court went on to recognize that "there can be no doubt that the FAA applies to contracts that later prove to be void and that the argument of whether a contract is void or voidable is for the arbitrator." *Id.* at 821. We find the same reasoning to be abundantly persuasive in this case.

Finally, we agree with Plaintiffs' claim that it is not obligated to arbitrate claims against Merrill Lynch or Defendant Bellmore because there is not an arbitration agreement between these parties. (*See* Doc. 40 at 16). As Plaintiffs acknowledge,

the Third Circuit has held that "arbitration agreements may be upheld against non-parties where the interests of such parties are directly related to, if not congruent with, those of a signatory." (*Id.* (citing *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith,* 7 F.3d 1110, 1122 (3d Cir.1993))). However, "[b]ecause arbitration is a creature of contract law, when asked to enforce an arbitration agreement against a non-signatory to an arbitration clause, we ask whether he or she is bound by that agreement under traditional principles of contract and agency law." *E.I. DuPont,* 269 F.3d at 195. "Generally, the common law theories used to bind a nonsignatory to an arbitration clause include third party beneficiary, agency and equitable estoppel." *Bouriez v. Carnegie Mellon Univ.,* 359 F.3d 292, 294 (3d Cir.2004); *see also Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995) (agreed with in *E.I. DuPont,* 269 F.3d at 195; stating "we have recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel"). Here, Defendants have not provided any evidence suggesting that Merrill Lynch or Bellmore are bound by the agreement to arbitrate under principles of contract or agency law. Thus, we will deny Defendants' motion to the extent that Plaintiffs are not obligated to submit their claims against Defendant Merrill Lynch and Defendant Bellmore to arbitration.

Therefore, we find that Plaintiffs have failed to allege that they were fraudulently induced to enter into the arbitration clause itself as opposed to the entire Financing Agreement. In addition, we find that Plaintiffs have failed to raise a genuine issue of material fact concerning whether a valid arbitration agreement was entered into as part of the Financing Agreement. Although Plaintiffs challenge the enforce-ability of the arbitration clause as a part of the Financing Agreement as a whole, such broad-based challenges to the entirety of agreements containing arbitration clauses, in an attempt to nullify the force of such clauses, seems inappropriate to the Court as contrary to the congressional intent underlying the FAA. *See Southland Corp. v. Keating,* 465 U.S. 1, 15, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (noting that Congress did not intend the FAA to be used to facilitate forum-shopping). Accordingly, we shall grant Defendants' motion.

**B. Motion of Defendant Merrill Lynch To Compel Arbitration and to Stay the Proceeding of the Crossclaim of Defendant Bell-more.**

In Merrill Lynch's motion to compel arbitration, Defendants seek an order requiring Bellmore to submit his crossclaim against Merrill Lynch to arbitration pursuant to the "Uniform Application for Securities Registration and Transfer" ("Form U–4") he signed as a condition of employment. (Doc. 36–6 at 3–4). Merrill Lynch claims it is well established that Form U–4 registration agreements involve transactions relating to commerce under the FAA, and as such, the arbitration clauses contained therein are subject to the FAA. (*Id.* (citing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24–25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Perry v. Thomas,* 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *Bazzone v. Nationwide Mut.,* 123 Fed.Appx. 503, 505 (3d Cir.2005); *Wood v. Prudential Ins. Co. Of Am.,* 207 F.3d 674, 681 (3d Cir.2000); *McMahon v. Lowry,* No. 06–CV–1350, 2007 WL 878491, at *2 (E.D.Pa. Mar. 20, 2007))).

Additionally, Merrill Lynch contends that in July of 2007, National Association of Securities Dealers ("NASD") and the New York Stock Exchange ("NYSE")

merged to form the Financial Industry Regulatory Authority, Inc. ("FINRA"), which adopted the current Code of Arbitration for Industry Disputes and claims filed on or after April 17, 2007. (Doc. 36–6 at 4–5). They also claim that the relevant portion of the FINRA Code, Rule 13200(a), states that a registered representative must arbitrate a dispute with a former employer.[3] (*Id.* at 5–6). Furthermore, Merrill Lynch claims that Bellmore's claims "either arise from his employment and/or termination at Merrill Lynch or from the underlying claims" in dispute herein, and therefore constitute a dispute between a member or an associated person. (*Id.*).

In response, Plaintiffs contend that to the extent Merrill Lynch's motion can be read as requesting a stay of the litigation involving Plaintiffs' complaint against Merrill Lynch, the same should be denied because any arbitration agreement between Defendant Merrill Lynch and Defendant Bellmore is inapplicable to stay the litigation of Plaintiffs' claims against either of these two defendants. (Docs. 41 at 1, 42 at 7). They argue that no "traditional principles of contract and agency law" would treat Plaintiffs as being bound by an arbitration agreement between Defendant Merrill Lynch and Defendant Bellmore. (*Id.*). Finally, Plaintiffs assert that their racketeering, fraud, breach of contract, and breach of fiduciary duty claims against Merrill Lynch should proceed unimpeded by any agreements between Bellmore and Merrill Lynch. (*Id.* at 8).

Here, we do not read Merrill Lynch's motion, entitled "Motion of Defendant Merrill Lynch to Compel Arbitration and to *Stay the Proceeding of the Crossclaim of Defendant Lawrence R. Bellmore,*" as requesting a stay of Plaintiffs' claims against Merrill Lynch or Bellmore. (*See* Doc. 36) (emphasis added). We find that to read Merrill Lynch's motion as requesting this relief strains the scope of the motion as presented to the Court. Furthermore, as we already addressed Plaintiffs' concerns that it not be hindered in litigating its claims against Defendants Merrill Lynch and Bellmore, (*see* section III.A *supra* ), we reiterate that Defendants have not provided any evidence suggesting that Merrill Lynch or Bellmore are bound by the Financing Agreement to arbitrate claims Plaintiffs lodged against these two defendants.

Therefore, as Bellmore has not provided a brief in opposition to Merrill Lynch's motion requesting that the Court compel him to submit his crossclaim against Merrill Lynch to arbitration, we will grant Merrill Lynch's instant motion. However, we note that our stay of Bellmore's crossclaim shall not act to stay the claims of Plaintiffs against Merrill Lynch or Bellmore.

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court finds that Plaintiffs have failed to raise a genuine issue of material fact concerning the validity or scope of the arbitration clause contained within the Financing Agreement. We also find that Defendant Bellmore has failed to oppose Merrill Lynch's motion to compel arbitra-

---

**3.** Rule 13200 specifically provides: "(a) **Generally**

Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among:

- Members;
- Members and Associated Persons; or
- Associated Persons.

(Doc. 36, Ex. 3).

tion. Consequently, we will grant the Jacobs Defendants' motion for summary judgment compelling arbitration, and Merrill Lynch's motion to compel arbitration of Defendant Bellmore's crossclaim. In light of the foregoing disposition, the Jacobs Defendants' motion to stay proceedings, including discovery, pending ruling on the motion for summary judgement to compel arbitration, shall be denied as moot.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  The Jacobs Defendants' Motion For Summary Judgment Compelling Arbitration (Doc. 32) is **GRANTED;**

2.  The Motion of Defendant Merrill Lynch to Compel Arbitration and to Stay the Proceeding of the Crossclaim of Defendant Lawrence R. Bellmore (Doc. 36) is **GRANTED** only to the extent of Defendant Bellmore's Crossclaim;

3.  The Jacobs Defendants' Motion to Stay Proceedings, Including Discovery, Pending Ruling on the Motion for Summary Judgment to Compel Arbitration (Doc. 43) is **DENIED** as moot;

4.  Plaintiffs and the Jacobs Defendants shall forthwith submit the claims raised in this action to arbitration in accordance with the arbitration provision of the Financing Agreement entered into between them;

5.  Defendant Bellmore shall forthwith submit the claims raised in his Crossclaim against Defendant Merrill Lynch to arbitration in accordance with the arbitration provision of the Form U–4 agreement entered into between them.